# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 51

APRIL TERM, A.D. 2016

May 18, 2016

SHRINERS HOSPITALS FOR
CHILDREN, In its capacity as beneficiary
of the Alfred J. and Pegge A. Cooksley
Trust,

Appellant
(Plaintiff),

v.

FIRST NORTHERN BANK OF
WYOMING, In its capacity as trustee of
the Alfred J. and Pegge A. Cooksley Trust,

Appellee
(Defendant).

S-15-0238, S-15-0239

SHRINERS HOSPITALS FOR
CHILDREN, In its capacity as beneficiary
of the Alfred J. and Pegge A. Cooksley
Trust,

Appellant
(Plaintiff),

v.

FIRST NORTHERN BANK OF
WYOMING, In its capacity as trustee of
the Alfred J. and Pegge A. Cooksley Trust,

Appellee
(Defendant).

*Appeal from the District Court of Johnson County*
*The Honorable William J. Edelman, Judge*

*Representing Appellant:*
> Christopher C. Voigt and Timothy M. Stubson of Crowley Fleck, PLLP, Casper, WY.  Argument by Mr. Voigt.

*Representing Appellee:*
> Tom C. Toner of Yonkee & Toner, Sheridan, WY; and Keith Dodson of Williams, Porter, Day & Neville, Casper, WY.  Argument by Mr. Toner.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]   Alfred "Jack" Cooksley and Pegge Cooksley placed their ranch and other property in a revocable charitable trust entitled the Alfred J. and Pegge A. Cooksley Trust (Trust). The Trust named Shriners Hospitals for Children (Shriners) and the Kalif Children's Travel Fund (Kalif) as beneficiaries, and First Northern Bank of Wyoming as the successor trustee.   The Trust specified the year 2100 as its termination date, and it directed First Northern Bank to hold the ranch and other property in the Trust until that date.   Upon termination of the Trust, First Northern Bank was to distribute the Trust assets to the beneficiaries, and, until then, the Bank was to distribute to the beneficiaries any Trust income not otherwise required to maintain and operate the ranch.

[¶2]   Pegge Cooksley died in 2007, and Jack Cooksley died in 2011.   After Jack Cooksley's death, Shriners filed a petition seeking termination of the Trust and an immediate distribution of the Trust assets.   In a separate action, Shriners filed a complaint against First Northern Bank alleging it had breached its fiduciary duty to the Trust beneficiaries and seeking the Bank's removal as trustee, an award of damages, and a disgorgement of any fees paid to the Bank.   Shriners' actions were consolidated, and following a bench trial the district court ruled against Shriners and issued a judgment denying all of its claims.   The court thereafter entered an order directing Shriners to pay First Northern Bank its attorney fees and costs in the amount of $48,343.74.   Shriners appeals both the judgment denying its claims and the order awarding fees and costs.   We affirm both.

## ISSUES

[¶3]   Shriners presents eight issues on appeal, which we reorder and condense into the following:

     1.     Whether the district court erred in concluding that the Trust did not violate the rule against perpetuities.

     2.     Whether the district court erred in concluding there were no grounds to terminate the Trust.

     3.     Whether the district court erred in concluding First Northern Bank did not breach its fiduciary duties to the beneficiaries.

     4.     Whether the district court erred in concluding there were no grounds to remove First Northern Bank as trustee.

     5.     Whether the district court erred in finding that First Northern Bank's attorney acted reasonably in response to Shriners' initial challenge to the Trust.

     6.     Whether the district court abused its discretion in ordering Shriners to pay First Northern Bank's attorney fees and costs.

1

[¶4]    First Northern Bank identifies the issues on appeal similarly and adds the additional question of whether Shriners should be required to pay First Northern Bank's attorney fees associated with this appeal.

## FACTS

### A.    Creation of Trust

[¶5]    On October 24, 2006, Jack and Pegge Cooksley jointly executed a Declaration of Trust, which created the Alfred J. and Pegge A. Cooksley Trust (Trust).  The Trust was a revocable trust and reserved in both Jack and Pegge Cooksley the power to revoke or amend the Trust, add or remove a trustee, or add or remove any asset.  The Declaration of Trust designated Jack Cooksley as the initial trustee, and upon his death, First National Bank of Buffalo (now First Northern Bank) was to serve as the successor trustee.[1]  The Cooksleys placed all of their property, both real and personal, in the Trust when they created the Trust in October 2006.

[¶6]    The principal asset of the Trust is an approximately 1,620-acre ranch that the Cooksleys purchased in 1951.  The ranch is located in Sheridan County, Wyoming, about twenty-five miles southeast of Sheridan and four miles west of Ucross and is accessible by U.S. Highway 14.  The ranch appraised at a value of $2,000,000.00 in 2011 and, with over a mile of frontage on Piney Creek, was described in that property appraisal as being located in "a highly sought after area situated along the year-round flowing Piney Creek."  The property appraiser observed: "The meadows/creek bottom land, located along Piney Creek, are not only highly productive (providing a good hay base for the ranching operation) but also esthetically pleasing and valued for their recreational amenities."

[¶7]    The Trust provided that while both Jack and Pegge Cooksley were living, the trustee was to pay the net income and principal (up to the entire amount) of the Trust to or for their benefit, in such amounts and at such times as either might direct.  Upon the death of either Jack or Pegge Cooksley, the Trust directed the following disposition:

>           The Trustee shall collect the income from the trust, and after deducting any charges and expenses properly chargeable to income in the administration of the trust, shall pay all of the net income, at least quarter-annually, to or for the benefit of the surviving Settlor, for life.  In the event any such payment of income is insufficient, in the sole opinion of the survivor of us, to provide for the health, education, maintenance and support of the survivor, the Trustee shall use

---

[1] Although at times during these proceedings, First Northern Bank was still First National Bank, we refer to it herein by its current name of First Northern Bank.

2

from time to time so much of the principal of this Trust as the survivor of us shall direct be withdrawn and used, paid or applied for those purposes.

[¶8]    Upon the death of the surviving Cooksley spouse, the Trust directed the following disposition of the Trust property:

2.2    Disposition After Death of Both Settlors.  Upon the death of the survivor of us, the Trustee shall administer, dispose of and distribute the then remainder of this trust, including income accruing after the date of death of the survivor of us, as follows:

A.    [distribution of personal property per any separate writing]

B.    [distribution of rocks, minerals, and historical artifacts to Jim Gatchell Museum]

C.    The Trustee may make distribution or disposition of any other tangible personal property as the Trustee, in its sole discretion, shall deem appropriate, including but not limited to private sale, auction and charitable donation.  We intend that the trust continue for some years, and direct the Trustee to dispose of tangible personal property so that it is not a burden on the trust.

Notwithstanding the foregoing, the Trustee is authorized to retain such tangible personal property as it deems appropriate or necessary to the management of the ranch land, buildings and residence.

D.    The Trustee shall thereafter hold, manage, invest, reinvest and distribute the remaining trust estate for the benefit of the **SHRINERS HOSPITAL FOR CRIPPLED CHILDREN – INTERMOUNTAIN**, or its successor, ("**SHRINERS HOSPITAL**") as follows:

(i)    The Trustee shall distribute to or apply for the benefit of the **SHRINERS HOSPITAL**, at least semi-annually, all of the net income of the trust.  We specifically direct that any and all accumulation of funds, whether from depletion, depreciation, and/or any other non-distributable source, be managed by the Trustee and used to the extent that the Trustee deems appropriate or necessary, to maintain the real property.  In the event that there are insufficient funds to pay such expenses, then the Trustee is authorized to withhold so much of the net income otherwise distributable as is

3

necessary or advisable, in the Trustee's sole discretion, to provide for such expenses.

(ii)     As soon as practical after the year 2100, the Trustee shall distribute outright to the **SHRINERS HOSPITAL** all of the then-remaining principal together with any undistributed income, free and clear from the restrictions of these Trust provisions, and when all funds have been distributed, the Trust shall terminate.

(iii)     If **SHRINERS HOSPITAL** shall cease to exist, without a successor qualified as an IRC Section 501(c)(3), as amended, then the Trustee shall designate one or more qualified IRC Section 501(c)(3) recipient(s), upon application to and approval of a court of competent jurisdiction, such qualified recipient(s) to be chosen according to the criteria of assisting and promoting the medical diagnosis, care and treatment of children in Wyoming and the greater intermountain region.

## B.     First Amendment to Trust

[¶9]     On January 15, 2007, the Cooksleys executed the first amendment to the Trust. The first amendment revised Paragraph 2.2.D(ii) to provide for distribution of the Trust assets to Shriners as soon as practical after the year 2050 and to provide for the Trust's termination after that 2050 distribution. The first amendment also added Paragraph 2.2.E to the Trust, which provided:

E.     The major asset that we have contributed to this Trust is our ranch, consisting of land, improvements and minerals. It is our intention that the Trustee continue to hold the ranch for the term of this trust, with the land remaining open and its use devoted to agriculture and/or preservation. We realize, however, that circumstances may occur that would make the continued ownership of this asset by the trust impractical or imprudent. By way of example, and by way of limitation, we list the following circumstances that would affect and possibly prohibit the continued ownership of the ranch:

(i).     The need for liquidity to pay for the extended nursing or home care for either or both of us; or

(ii).     The inability of the trust assets to provide sufficient income from all sources (interest, dividends, surface lease, surface damages, easements, rights-of-way, mineral royalties, mineral lease bonuses and other revenue

4

sources) to pay the costs of maintaining the ranch, administering the trust and providing for the care of one or both of us.

In making its determination as to whether to sell the ranch land, we instruct the Trustee to evaluate the expected duration of the specific circumstances, the likelihood of a change in the circumstances, and the opportunities for a partial disposition of the ranch land to meet the financial needs. If all, or substantially all, of the ranch surface has been sold, the Trustee shall distribute the assets, after paying reasonable expenses and obligations, as described in Subsection D above, and this Trust shall terminate.

[¶10] Just over a month after the first amendment to the Trust was executed, on February 21, 2007, Pegge Cooksley died.

## C.   Second Amendment to the Trust

[¶11] On November 13, 2007, Jack Cooksley executed a second amendment to the Trust. The second amendment replaced section 2.2 in its entirety, but section 2.2.A through C, governing the disposition of personal property, remained unchanged. Likewise, section 2.2.E., defining the types of circumstances under which the trustee was authorized to sell the ranch or a portion of the ranch, was not substantively changed by the second amendment to the Trust, though the language was revised to reflect Jack Cooksley's status as the surviving settlor. The changes were to section 2.2.D and they included: 1) the addition of Kalif Children's Travel Fund (Kalif) as an additional beneficiary; and 2) an extension of the Trust's termination date back to the year 2100. The revised section 2.2.D provided:

D.     The Trustee shall thereafter divide, manage, invest, reinvest and distribute the remaining trust estate in two funds, 85% for the benefit of the **SHRINERS HOSPITAL FOR CRIPPLED CHILDREN – INTERMOUNTAIN**, or its successor, ("**SHRINERS HOSPITAL**"), and 15% for the benefit of the **KALIF CHILDREN'S TRAVEL FUND** of the Kalif Shrine in Sheridan, Wyoming, or its successor, ("**KALIF TRAVEL FUND**").

(i).     The Trustee shall distribute to or apply for the benefit of the **SHRINERS HOSPITAL**, at least semi-annually, 85% of the net income of the trust, and shall distribute to or apply for the benefit of the **KALIF TRAVEL FUND**, at least semi-annually, 15% of the net income of the trust. I specifically direct that any and all accumulation of

funds, whether from depletion, depreciation, and/or any other non-distributable source, be managed by the Trustee and used to the extent that the Trustee deems appropriate or necessary, to maintain the real property. In the event that there are insufficient funds to pay such expenses, then the Trustee is authorized to withhold so much of the net income otherwise distributable as is necessary or advisable, in the Trustee's sole discretion, to provide for such expenses.

(ii). As soon as practical after the year 2100, the Trustee shall distribute outright to the **SHRINERS HOSPITAL** 85% and to the **KALIF TRAVEL FUND** 15% of the then-remaining principal together with any undistributed income, free and clear from the restrictions of these Trust provisions, and when all funds have been distributed, this Trust shall terminate.

(iii). If the **SHRINERS HOSPITAL** or the **KALIF TRAVEL FUND** shall cease to exist, without a successor qualified as an IRC Section 501(c)(3), as amended, then the Trustee shall designate one or more qualified IRC Section 501(c)(3) recipient(s), upon application to and approval of a court of competent jurisdiction, such qualified recipient(s) to be chosen by the extent to which it/they perform or enable assistance similar in nature and function to that of the organization being replaced. For example, a designee to replace the **SHRINERS HOSPITAL** should assist and promote the medical diagnosis, care and treatment of children in Wyoming and the greater intermountain region; a designee to replace the **KALIF TRAVEL FUND** should assist children and their families in the Sheridan area with travel expenses related to or arising from a child's illness.

[¶12] When First Northern Bank received a copy of the second amendment to the Trust, it requested confirmation that Mr. Cooksley did in fact intend to extend the Trust's termination date from the Year 2050 to the Year 2100. Mr. Cooksley's attorney, Darlene Reiter, responded in a letter dated January 17, 2008:

> I discussed the term of the Cooksley Trust with Jack when we met earlier this week. Jack confirmed that the Trust is intended to continue to the year 2100, unless earlier terminated by exercise of the very limited provision for sale of the surface.

6

## D.      Third Amendment to the Trust

[¶13]  On January 26, 2009, Jack Cooksley executed a third amendment to the Trust. The third amendment revised only the provisions of the Trust affecting the disposition of Mr. Cooksley's personal property.  The Trust, as revised by the third amendment, directed the trustee, upon Mr. Cooksley's death, to convey possession of all of Mr. Cooksley's tangible personal property to his friend John Piesik and his attorney Darlene Reiter.  The amendment gave Mr. Piesik and Ms. Reiter sole discretion over the disposition of the personal property, including by private sale, auction, gift, charitable donation, or other disposition.  The amendment further stated: "I intend that the trust continue for some years, and direct Piesik and Reiter to dispose of tangible personal property so that it is not a burden on the trust."  Proceeds realized from the sale of any personal property were to be submitted to First Northern Bank as trustee.

## E.      Shriners' Challenge to Trust following Jack Cooksley's Death

[¶14]  Jack Cooksley died on March 17, 2011.  On April 28, 2011, Wendy Martin, a trust officer at First Northern Bank, sent a letter to Patricia Dockery in Shriners' legal department informing her of Mr. Cooksley's death and providing copies of the Trust and the three amendments to the Trust.  On May 20, 2011, Ms. Dockery notified Ms. Martin of concerns Shriners had with the Trust and its amendments.  Ms. Dockery cited three concerns: first, she suggested the Trust's year 2100 termination date would appear to violate Wyoming's statutory rule against perpetuities; second, she expressed a concern that Mr. Cooksley's attorney, Darlene Reiter, had violated the Rules of Professional Conduct by accepting a substantial gift from Mr. Cooksley when she prepared the third amendment to the Trust giving her a great deal of latitude in disposing of Mr. Cooksley's personal property; and third, she indicated that she had received information that Mr. Cooksley renegotiated an agricultural lease on the ranch, prior to the lease's expiration, resulting in terms less favorable to the Trust and she expressed concerns regarding Mr. Cooksely's motivation and his mental and physical status when the lease was renegotiated.[2]

[¶15]  On September 1, 2011, Patricia Dockery sent another letter to First Northern Bank again raising her concern that the Trust violated the statutory rule against perpetuities. Ms. Dockery wrote:

> Shriners Hospitals for Children would be interested in the early termination of the trust and outright distribution of the trust assets.  If court action is necessary to terminate the trust,

---

[2] Facts concerning the agricultural lease are relevant to Shriners' claim that First Northern Bank breached its fiduciary duties and will be set forth in that part of our discussion.

we would suggest that perhaps Mr. Cooksley's attorney, Darlene Reiter, should absorb those costs as the effective date of W.S. § 34-1-139 is some three years prior to the execution of the Cooksley's trust and Ms. Reiter had a duty to be familiar with the statutes of the state in which she practices.

[¶16]  On October 6, 2011, First Northern Bank acted on Shriners' concerns regarding the rule against perpetuities by filing a Petition to Amend Trust in the Fourth Judicial District Court, Johnson County.  The petition alleged that the Trust violated the rule against perpetuities and asked that the court enter an order amending the Trust to provide a termination date of not later than twenty-one years after the last to die of Jack and Pegge Cooksley.  The next day, October 7, 2011, counsel for First Northern Bank, Tonia Hanson, sent a letter to Patricia Dockery informing her of the Bank's filing of the petition.  Ms. Hanson wrote:

> The Trustee carefully considered your request that the Court Petition include a request to terminate the Trust. However, after considering the matter fully and taking into consideration the intent of the Settlors, Alfred J. Cooksley and Pegge A. Cooksley, and in consulting with their close friends, it was determined that the intent of Mr. and Mrs. Cooksley was that the ranch lands be maintained for a long period of time with the beneficiaries enjoying the income from the property.  Terminating the Trust would not accomplish this intent.

[¶17]  On May 14, 2012, Shriners filed an objection to the First Northern Bank's petition to amend the trust along with its own petition requesting an order terminating the Trust. Shriners alleged that the Trust could not be modified without consent of the beneficiaries and because Shriners objected to any modification, the Bank's petition to amend should be denied.  Shriners further alleged that continuation of the Trust was not economical or necessary to achieve a material purpose of the Trust and its termination was therefore proper.

[¶18]  On June 18, 2012, the district court held a hearing on First Northern Bank's petition to amend the Trust and Shriners' petition to terminate the Trust.  Following that hearing, First Northern Bank moved to amend its petition, arguing:

> 3.    [First Northern Bank's] original Petition inadvertently alleged that the Trust violated the [rule against perpetuities].  Evidence was presented at the hearing alleging the Trust is a charitable trust in which case there is no violation of the Rule Against Perpetuities.  Justice requires

allowing [First Northern Bank] to amend the Petition in order to conform the pleadings to the evidence presented at the hearing in this matter.

4. Based upon the evidence presented, it is in the best interest of justice that [First Northern Bank] be allowed to amend its petition to allege that the Trust be amended or reformed only in the event the court finds the Trust is not a charitable trust as defined in W.S. § 4-10-103(a)(iii). [Underline in original.]

[¶19] On August 20, 2012, Shriners filed a new and separate action against First Northern Bank. Shriners filed its new complaint again in the Fourth Judicial District Court, Johnson County, this time alleging that First Northern Bank breached its fiduciary duty to the Trust beneficiaries by failing to diversify the Trust's investments and failing to prudently invest and manage the Trust's assets, and that First Northern Bank breached its duty of loyalty to the beneficiaries, its duty of prudent administration, its duty of good faith, and its duty to minimize the costs of administering the Trust. For its relief, Shriners sought removal of First Northern Bank as trustee, an order compelling diversification and sale of the Cooksley ranch, and an order denying any further compensation to the Bank, imposing a surcharge against the Bank, and a disgorgement of any and all fees the Bank had received from the Trust.

[¶20] On that same date, August 20, 2012, the district court issued a decision letter addressing First Northern Bank's petition to amend the Trust and Shriners' petition to terminate the Trust. The court ruled, citations omitted:

After giving consideration to the arguments of counsel and materials of record in this matter, the Court finds that the trust is a charitable trust such that the rule of perpetuities does not apply. * * * Accordingly, Trustee's Petition to Amend Trust on the basis that the trust violates the rule against perpetuities is denied. Similarly, Trustee's Motion for Leave of Court to Amend Petition appears to be an alternative pleading which is made moot by this Court's decision that the trust is a charitable trust. Therefore, this motion is also denied.

The beneficiaries' petition to terminate the trust on the basis that continuing the trust is no longer practicable or economic raises questions of fact which will necessitate an evidentiary hearing. Therefore, the Court does not grant or deny the beneficiaries' motion. Rather, a hearing will need to be set to hear evidence to determine whether or not such efforts have merit.

9

[¶21] On August 31, 2012, Shriners filed a motion asking the district court to reconsider its ruling on the application of the rule against perpetuities. In seeking reconsideration, Shriners did not disagree that the Trust is a charitable trust, rather it argued that Wyoming's rule against perpetuities applies regardless of whether a trust is charitable or not. Shriners stated:

> 3. The Court, in the Decision Letter, found that the Trust is a charitable trust. Shriners does not dispute this finding. However, the Court also found that the Trust "is a charitable trust such that the rule of perpetuities does not apply." It is this finding, that charitable trusts are not subject to Wyoming's rule against perpetuities, which Shriners is requesting the Court reconsider.

[¶22] On September 14, 2012, the district court issued an order denying the motion for reconsideration. Shriners' petition to terminate the Trust and its complaint against First Northern Bank then moved forward, and on November 5, 2012, the district court, with the agreement of both parties, entered an order consolidating the two actions.

[¶23] A two-day bench trial was held on the two actions on March 17-18, 2015. Both parties submitted proposed findings and orders, and on June 23, 2015, the district court issued its Findings of Fact, Conclusions of Law and Judgment. Relevant to Shriners' claims, the court found:

> [T]he Trust has two valid material charitable purposes: (1) to keep the Ranch open and used for agricultural purposes or preservation until 2100, and (2) to benefit Shriners and Kalif. This Court further holds that, according to the Trust terms, the material charitable purpose of keep[ing] the Ranch open takes precedence.

[¶24] The district court concluded that termination of the Trust would defeat the Trust's dominant material purpose of retaining the ranch until the year 2100 and that First Northern Bank did not breach any of its fiduciary obligations. Based on these conclusions, the court denied Shriners' requested relief in its entirety. The court further ordered that "Shriners shall be responsible for its own attorney's fees, and FNB shall submit the appropriate affidavits and other evidence so the court may consider an award of its attorney fees."

[¶25] On July 10, 2015, First Northern Bank filed its motion for attorney fees seeking $48,343.74 in fees and costs for the Bank's trial counsel, Tom Toner, and $89,067.09 paid by the Bank's insurance company for expert witness fees and counsel the insurance

company retained to defend the Bank. On September 10, 2015, the district court issued its Order Awarding Attorney's Fees. The court found Shriners filed its litigation in bad faith and would therefore be responsible for payment of the Bank's fees and costs. The court limited Shriners' responsibility, however, to payment of Mr. Toner's fees and costs in the requested amount of $48,343.74.

[¶26] Shriners filed timely notices of appeal from the district court's Findings of Fact, Conclusions of Law and Judgment and its Order Awarding Attorney's Fees.

## STANDARD OF REVIEW

[¶27] We have stated our standard of review following a bench trial as follows:

> When reviewing a bench trial, this Court reviews the trial court's findings of fact for clear error and its conclusions of law *de novo*. *Moore v. Wolititch*, 2015 WY 11, ¶ 9, 341 P.3d 421, 423 (Wyo.2015). Additionally,
>
> > [t]he factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
>
> *Id*. (quoting *Miner v. Jesse & Grace, LLC*, 2014 WY 17, ¶ 17, 317 P.3d 1124, 1131 (Wyo.2014)). "'We assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.'" *Id*., ¶ 10, 341 P.3d at 423 (quoting Miner, ¶ 17, 317 P.3d at 1131).

*Wimer v. Cook*, 2016 WY 29, ¶ 9, ___ P.3d ___, (Wyo. 2016).

[¶28] To the extent the district court's rulings require use of an additional or different standard of review, we will set that out in our discussion of the affected ruling.

## DISCUSSION

### A. Rule against Perpetuities

[¶29] The district court ruled as a matter of law that the rule against perpetuities did not apply to the Trust because the Trust is a charitable trust. The court's ruling preceded the bench trial, and at the time of the ruling, both parties agreed that the Trust is a charitable trust. On appeal, Shriners contends that the Trust is not a charitable trust, at least not the portion of the Trust devoted to retention of the Cooksley ranch. Shriners further contends that even if the Court were to conclude that the Trust is a charitable trust, Wyoming's rule against perpetuities does not recognize an exception for charitable trusts. We conclude that we need not address either question, because regardless of whether the Trust is charitable or not, and regardless of whether our rule against perpetuities recognizes an exception for charitable trusts, the rule against perpetuities does not apply here.

[¶30] Application of the rule against perpetuities is a question of law, and as stated above, we review a district court's conclusions of law *de novo*. *Wimer*, ¶ 9, ___ P.3d ___. Additionally, this Court may affirm a district court ruling on any basis appearing in the record. *Redland v. Redland*, 2015 WY 31, ¶ 17, 346 P.3d 857, 866 (Wyo. 2015).

[¶31] Article 1, § 30 of the Wyoming Constitution states: "Perpetuities and monopolies are contrary to the genius of a free state, and shall not be allowed." Wyoming's rule against perpetuities has been codified and provides, in relevant part:

> No interest in real or personal property shall be good unless it must vest not later than twenty-one (21) years after some life in being at the creation of the interest and any period of gestation involved in the situation to which the limitation applies. The lives selected to govern the time of vesting must not be so numerous nor so situated that evidence of their deaths is likely to be unreasonably difficult to obtain. It is intended by the enactment of this statute to make effective in this state the American common-law rule against perpetuities.

Wyo. Stat. Ann. § 34-1-139(a) (LexisNexis 2015).

[¶32] Wyoming's rule against perpetuities encourages the constitutional goal of alienability of property by voiding property interests that will not vest within the statutory term. *Horse Creek Conservation Dist. v. State ex rel. Wyo. AG*, 2009 WY 143, ¶ 40, 221 P.3d 306, 318 (Wyo. 2009). The rule against perpetuities does not apply to a property interest that has already vested. *Id.*, ¶ 41, 221 P.3d at 318 (citing *Williams v. Watt*, 668

12

P.2d 620, 633 (Wyo.1983)). A property interest vests at the point when no contingency can defeat the interest. *Horse Creek Conservation Dist.*, ¶ 41, 221 P.3d at 319; *Williams*, 668 P.2d at 633. We have distinguished vested and contingent interests as follows:

> The broad distinction between vested and contingent remainders is this: In the first, there is some person in esse known and ascertained, who, by the will or deed creating the estate, is to take and enjoy the estate, and whose right to such remainder no contingency can defeat. In the second, it depends upon the happening of a contingent event, whether the estate limited as a remainder shall ever take effect at all. The event may either never happen, or it may not happen until after the particular estate upon which it depended shall have been determined, so that the estate in remainder will never take effect.

*Williams*, 668 P.2d at 633 (quoting 28 Am.Jur.2d Estates § 242, p. 396).

[¶33] Pursuant to the Trust terms, the beneficiaries, Shriners and Kalif, do not take possession of the Trust property until the year 2100. Their interest in that property, however, vested upon Jack Cooksley's death. There is no contingency that can defeat the beneficiaries' interest in the property, and it is certain that when the Trust terminates in the year 2100, the beneficiaries will receive possession of the Trust property. This result is not affected by the risk that the Trust property may be diminished in some respect before the beneficiaries take possession. We have explained:

> Although it may be uncertain whether a remainder will ever take effect in possession, it will nevertheless be a vested remainder if the interest is fixed. It is the uncertainty of the right of enjoyment, and not the uncertainty of its actual enjoyment, which renders a remainder contingent and distinguishes it from a vested remainder.

*Williams*, 668 P.2d at 633 (quoting 28 Am.Jur.2d Estates § 243).

[¶34] Shriners and Kalif have a fixed and vested interest to which the rule of perpetuities does not apply. This conclusion is captured in the following explanation:

> The [rule against perpetuities] requires a creator of a contingent interest to ensure that any contingent interest will vest or fail within 21 years of the death of a life or lives in being at creation. It is concerned with vesting in interest or ownership, and not with vesting in possession (the right to

13

occupy or enjoy the subject matter of the transfer). Thus if a fee owner dies leaving a will by which he creates a trust for A and A's successors to last for 25 years, remainder to B (a person living at that time), the Rule is not involved because the interest of B is vested at once as far as ownership is concerned, and the fact that B will not come into the enjoyment of the property until the lapse of 25 years is immaterial to the Rule, because no contingent interest is involved.

George Gleason Bogert & Helen S. Shapo, *The Law of Trusts and Trustees* § 213, p. 170 (3d ed. 2007).

[¶35] Because the interest of Shriners and Kalif in the Trust property was fixed and vested upon Jack Cooksley's death, the Trust does not violate the rule against perpetuities. We therefore uphold the district court's ruling on First Northern Bank's petition to amend the Trust.

**B.    Termination of the Trust**

[¶36] The district court rejected Shriners' petition to terminate the Trust based on its findings that holding the ranch in the Trust until the year 2100 was the Trust's dominant material purpose and termination of the Trust would defeat that material purpose. Shriners contends that the district court erred in finding that retention of the ranch was a material purpose of the Trust. It further contends that the Trust's only remaining material purpose is that of benefitting Shriners and Kalif, which purpose it asserts is better served by termination of the Trust. We disagree and find the district court's ruling supported by both the Trust's plain terms and Wyoming law.

[¶37] Section 411 of Wyoming's Uniform Trust Code (UTC) provides for termination of a trust if "no material purpose of the trust remains to be achieved or the purposes of the trust have become unlawful, contrary to public policy or impossible to achieve." Wyo. Stat. Ann. § 4-10-411(a) (LexisNexis 2015). Section 413 allows termination "if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust." Wyo. Stat. Ann. § 4-10-413(a) (LexisNexis 2015). This Court has also adopted the Restatement (Second) of Trusts § 337, which, consistent with the UTC, allows beneficiaries to compel the early termination of a trust as follows:

> (1)    Except as stated in Subsection (2), if all of the beneficiaries of a trust consent and none of them is under an incapacity, they can compel the termination of the trust.

14

> (2)      If the continuance of the trust is necessary to carry out a material purpose of the trust, the beneficiaries cannot compel its termination.

*American Nat'l Bank v. Miller*, 899 P.2d 1337, 1340 (Wyo. 1995).

[¶38]  In adopting this Restatement provision, we observed:

> This rule balances between protecting and enforcing a grantor's instructions regarding a trust, and providing for distribution to beneficiaries at the earliest time after all the grantor's material purposes have been fulfilled. The law should guard and enforce a grantor's wishes and purposes, so long as they remain unfulfilled. When those purposes have been fulfilled, however, the law should provide for the most expeditious termination and distribution of the trust estate.

*American Nat'l Bank*, 899 P.2d at 1340.

[¶39]  Shriners does not contend that unanticipated circumstances have arisen, or that retention of the Cooksley ranch has become unlawful, contrary to public policy or impossible to achieve.  Shriners contends that the district court's decision should be overturned on three grounds: 1) As a matter of trust interpretation, retention of the ranch was not a material purpose of the Trust; 2) Retention of a trust asset cannot be a material purpose of a trust; and 3) Retention of the ranch is permissive, not mandatory, and the circumstances warrant termination.  We will address each argument in turn.

## 1.      Interpretation of the Trust

[¶40]  Interpretation of an unambiguous trust instrument is a matter of law for the court. *Forbes v. Forbes*, 2015 WY 13, ¶ 23, 341 P.3d 1041, 1051 (Wyo. 2015).  We have said:

> The meaning of a trust is determined by the same rules that govern the interpretation of contracts. In interpreting a trust, our primary purpose is to determine the intent of the settlor. *Wells Fargo Bank Wyoming, N.A. v. Hodder*, 2006 WY 128, ¶ 21, 144 P.3d 401, 409 (Wyo.2006); *First Nat'l Bank & Trust Co. v. Brimmer*, 504 P.2d 1367, 1369 (Wyo.1973). We construe the trust instrument as a whole, attempting to avoid a construction which renders a provision meaningless. *Id*. "We strive to reconcile by reasonable interpretation any provisions which apparently conflict before adopting a construction which would nullify any provision." *Wells Fargo*, ¶ 21, 144

15

P.3d at 409. *See also*, *Purcella v. Purcella*, 2011 WY 124, ¶ 14, 258 P.3d 730, 734–35 (Wyo.2011).

*Evans v. Moyer*, 2012 WY 111, ¶ 21, 282 P.3d 1203, 1210 (Wyo. 2012).

[¶41] Shriners argues that the material purpose of the Trust was established in the Cooksley's Declaration of Trust with the Declaration's statement: "The purpose of this agreement is to create the trust as described in Exhibit A for our benefit and the other beneficiaries designated there." Shriners points out that the other designated beneficiaries are Shriners and Kalif and that each amendment to the Trust reaffirmed all unaltered provisions of the Declaration and Trust, including this statement of purpose. This is true, and it would certainly be erroneous to suggest that the benefit to Shriners and Kalif was not one of the Trust's material purposes. To say that it is the only remaining material purpose, however, requires that we ignore other clear statements of the settlors' intent, contrary to our rules of interpretation.

[¶42] The first amendment to the Trust added section 2.2.E, which addressed the settlors' desire that the Cooksley ranch be retained in the Trust (emphasis added):

> E.      The major asset that we have contributed to this Trust is our ranch, consisting of land, improvements and minerals. ***It is our intention that the Trustee continue to hold the ranch for the term of this trust, with the land remaining open and its use devoted to agriculture and/or preservation***. We realize, however, that circumstances may occur that would make the continued ownership of this asset by the trust impractical or imprudent. By way of example, and not by way of limitation, we list the following circumstances that would affect and possibly prohibit the continued ownership of the ranch:
>
> (i).      The need for liquidity to pay for the extended nursing or home care for either or both of us; or
>
> (ii).      The inability of the trust assets to provide sufficient income from all sources (interest, dividends, surface lease, surface damages, easements, rights-of-way, mineral royalties, mineral lease bonuses and other revenue sources) to pay the costs of maintaining the ranch, administering the trust and providing for the care of one or both of us.
>
> In making its determination as to whether to sell the ranch land, we instruct the Trustee to evaluate the expected duration of the specific circumstances, the likelihood of a change in the circumstances, and the opportunities for a

partial disposition of the ranch land to meet the financial needs. If all, or substantially all, of the ranch surface has been sold, the Trustee shall distribute the assets, after paying reasonable expenses and obligations, as described in Subsection D above, and this Trust shall terminate.

[¶43] Shriners acknowledges the language of this provision but contends it cannot be read to reflect a material purpose of the Trust because the provision was added as an "after-thought." We find no merit in this argument, first because Shriners cites no authority to suggest a trust cannot be amended to add an additional material purpose and, moreover, because it ignores the Trust's original terms reflecting the settlors' intention that the ranch be retained.

[¶44] In the Trust's original version, it had a termination date of the year 2100, with the Trust assets, including the ranch, to be distributed after that date. Additionally, the Trust stated that the settlors intend "the trust [to] continue for some years, and direct the Trustee to dispose of tangible personal property so that it is not a burden on the trust," and it authorized the trustee "to retain such tangible personal property as it deems appropriate or necessary to the management of the ranch land, buildings and residence." It further stated (emphasis added):

> The Trustee shall distribute to or apply for the benefit of the **SHRINERS HOSPITAL**, at least semi-annually, all of the net income of the trust. *We specifically direct that any and all accumulation of funds*, whether from depletion, depreciation, and/or any other non-distributable source, *be managed by the Trustee and used to the extent that Trustee deems appropriate or necessary, to maintain the real property. In the event that there are insufficient funds to pay such expenses, then the Trustee is authorized to withhold so much of the net income otherwise distributable as is necessary or advisable, in the Trustee's sole discretion, to provide for such expenses*.

[¶45] These provisions remained largely unchanged with the amendments to the Trust, except that the first amendment shortened the Trust's term to the year 2050 and the second amendment extended it back out to 2100. Thus, although the first amendment's addition of section 2.2.E perhaps made the intention more explicit, the settlors' intent was clear from the outset that the ranch was to be retained, and its operation and maintenance trumped payment of income to Shriners and Kalif. Given this clear and continuing expression of the settlors' intent, we must agree with the district court's conclusion that retention of the ranch was at least a material purpose of the Trust, if not its paramount purpose.

## 2.     Retention of Trust Asset as Material Purpose

[¶46]  Shriners next argues that retention of a trust asset cannot be a material purpose of a trust.  We again disagree.

[¶47]  Under the Uniform Trust Code, a trust may be created for any purpose that is lawful, not contrary to public policy, and possible to achieve.  Specifically, section 405 provides:  "A trust may be created only to the extent its purposes are lawful, not contrary to public policy, and possible to achieve. A trust and its terms shall be for the benefit of its beneficiaries."  Wyo. Stat. Ann. § 4-10-405 (LexisNexis 2015).  The comments to the Uniform Trust Code explain:

> * * * A trust with a purpose that is unlawful or against public policy is invalid. Depending on when the violation occurred, the trust may be invalid at its inception or it may become invalid at a later date. The invalidity may also affect only particular provisions. Generally, a trust has a purpose which is illegal if (1) its performance involves the commission of a criminal or tortious act by the trustee; (2) the settlor's purpose in creating the trust was to defraud creditors or others; or (3) the consideration for the creation of the trust was illegal. See Restatement (Third) of Trusts Section 28 cmt. a (Tentative Draft No. 2, approved 1999); Restatement (Second) of Trusts Section 60 cmt. a (1959). Purposes violative of public policy include those that tend to encourage criminal or tortious conduct, that interfere with freedom to marry or encourage divorce, that limit religious freedom, or which are frivolous or capricious. *See* Restatement (Third) of Trusts Section 29 cmt. d-h (Tentative Draft No. 2, 1999); Restatement (Second) of Trusts Section 62 (1959).
> * * * [A] trust must have an identifiable beneficiary unless the trust is of a type that does not have beneficiaries in the usual sense, such as a charitable trust or, as provided in Sections 408 and 409, trusts for the care of an animal or other valid noncharitable purpose. The general purpose of trusts having identifiable beneficiaries is to benefit those beneficiaries in accordance with their interests as defined in the trust's terms. The requirement of this section that a trust and its terms be for the benefit of its beneficiaries, which is derived from Restatement (Third) of Trusts Section 27(2) (Tentative Draft No. 2, approved 1999), implements this general purpose. While a settlor has considerable latitude in

specifying how a particular trust purpose is to be pursued, the administrative and other nondispositive trust terms must reasonably relate to this purpose and not divert the trust property to achieve a trust purpose that is invalid, such as one which is frivolous or capricious. See Restatement (Third) of Trusts Section 27 cmt. b (Tentative Draft No. 2, approved 1999).

Uniform Trust Code § 404 cmt. (Unif. Law Comm'n).

[¶48] Retention of the ranch is not unlawful, contrary to public policy, or impossible. That said, we recognize that the Trust's retention of the ranch is not necessarily a term directed to the benefit of Shriners and Kalif, given that it delays their immediate possession of the asset and consumes income that would otherwise be available to them. As the comments to the Uniform Trust Code explain, though, this does not place the Trust crosswise with section 405. The Code recognizes there may be trusts that do not have a definite and ascertainable beneficiary. Moreover, a trust may have more than one purpose, and its purposes can be a mix of charitable and noncharitable. As one court explained:

> A 'mixed trust' is usually defined as one which possesses private and public elements and is partly charitable and partly for the benefit of private individuals or non-charitable objects. It is not objectionable to have a mixed trust as such. Bogert, Law of Trusts, § 65 (Fifth Edition 1973). The objectionable characteristic of a mixed trust having both charitable and non-charitable purposes, is not due to the commingling of purposes. The objectionable characteristic occurs when the charitable portion of the trust is invalid for some reason or another, or the private portion of the trust is invalid for some reason or another, and the two trusts cannot be separated and individually enforced. If a mixed indivisible trust satisfies all of the requirements for a valid charitable trust and all of the requirements of a valid private trust, there is no good reason why the courts should not carry out the intentions of the settlor by enforcing the trust. Bogert, Law of Trusts, § 65 (Fifth Edition 1973); 2A Bogert, Trusts and Trustees, § 372, p. 85. *See also Moskowitz v. Federman*, 72 Ohio App. 149, 51 N.E.2d 48 (1943).

*Rice v. Morris*, 541 S.W.2d 627, 631 (Tex. Civ. App. 1976).

[¶49] The Trust has two distinct material purposes: 1) retention of the ranch; and 2) providing a benefit to Shriners and Kalif. We need not decide whether the purpose served by retention of the ranch is a charitable purpose or a noncharitable purpose. The Code allows for either, and because we resolved the Trust's alleged violation of the rule against perpetuities without regard to the Trust's charitable status and that was the only challenge to the Trust's validity, the determination will have no effect on our ruling.

[¶50] We turn then to Shriners' argument that the district court should have ordered termination of the Trust because the ranch is subject to a permissive retention requirement only and the circumstances warrant termination.

## 3.  Permissive Retention Requirement

[¶51] Shriners asserts that the rate of return First Northern Bank is earning on the ranch is far less than Shriners and Kalif would realize if the ranch were sold or distributed to them outright. For this reason, and because the Trust's general provisions give the trustee authority to terminate any fund the trustee in its sole discretion determines to be uneconomical or inefficient, and Section 2.2.E gives the trustee discretion in particular to dispose of the ranch and terminate the Trust, Shriners contends that the Trust should be terminated.

[¶52] This argument fails first and foremost because termination of a trust is not permitted under Wyoming law if the continuance of the trust is necessary to carry out a material purpose of the trust. *American Nat'l Bank*, 899 P.2d at 1340; Wyo. Stat. Ann. § 4-10-411(a); Wyo. Stat. Ann. § 4-10-413(a). Holding the ranch in the Trust until the year 2100 is a material purpose of the Trust and requires continuation of the Trust. Sale of the ranch and termination of the Trust would obviously defeat that material purpose.

[¶53] Additionally, although the Trust's general provisions do give the trustee discretion to dispose of uneconomic assets, the more specific section 2.2.E applies when the asset to be sold is the ranch. *See Douglas v. Newell*, 719 P.2d 971, 973 (Wyo. 1986) (holding will's more specific provision prevails over general provision). Section 2.2.E limits sale of the ranch to those circumstances in which continued ownership is "impractical or imprudent," and by way of example cites insufficient funding for nursing or home care and insufficient funding for trust administration and the settlor's care. While the cited examples were not exclusive, "[t]he principle of *ejusdem generis* tells us that 'general words, [associated with] an enumeration of words with specific meanings, should be construed to apply to the same general kind or class as those specifically listed.'" *DiFelici v. City of Lander*, 2013 WY 141, ¶ 15, 312 P.3d 816, 821 (Wyo. 2013). The desires of Shriners and Kalif to greater income does not fit with examples cited for the ranch's sale. Indeed, the Trust implicitly excludes beneficiary distributions as a reason to sell the ranch by authorizing Trust income to be withheld from beneficiary distributions and directed first to maintenance of the ranch.

[¶54] For all the reasons stated above, we find no error in the district court's denial of Shriners' petition to terminate the Trust.

## C. Breach of Fiduciary Duties

[¶55] Shriners contends that First Northern Bank breached its fiduciary duties to the beneficiaries by: 1) construing the Trust unreasonably and with no good faith basis to support its interpretation; 2) failing to diversify the Trust's investments; 3) failing to renegotiate the agricultural lease entered into by settlor Jack Cooksley prior to his death and including unfavorable terms in a clarifying amendment to the lease; and 4) failing to investigate "red flags" relating to the agricultural lease. We find no support for Shriners' breach of fiduciary duties claim in Wyoming law or the record, and we uphold the district court ruling rejecting the claim.

[¶56] We begin our discussion with the legal framework governing a trustee's obligations in administering a trust. We will then address the specific allegations underlying Shriners' claim.

## 1. Legal Framework Governing Trustee's Obligations

[¶57] Shriners bases its breach of fiduciary duties claim on the premise that a trustee has a singular obligation and that obligation is to act solely in the best interests of the beneficiaries. This premise is flawed because it ignores the trustee's co-equal obligation to carry out the trust according to its terms and to carry out the settlor's intentions. We have said:

> A trustee, however, acts on behalf of both the beneficiaries and the grantor of the trust. A fundamental duty of a trustee is to carry out the terms of the trust. 76 Am.Jur.2d *Trusts* §§ 374, 375 (1992). "The clearly expressed intention of the settlor should be zealously guarded...." *First Nat'l Bank & Trust Co. v. Brimmer*, 504 P.2d 1367, 1371 (Wyo.1973).
>
> A trustee has an obligation to defend the trust in order to carry out the material purposes of the trust.

*American Nat'l Bank*, 899 P.2d at 1339.

[¶58] While our decision in *American Nat'l Bank* preceded Wyoming's adoption of the Uniform Trust Code, the Code's adoption did not alter these fundamental obligations of a trustee. To the contrary, Section 801 of the Code affirms the trustee's obligation to "administer the trust in good faith, ***in accordance with its terms and purposes*** and the

21

interests of the beneficiaries, and in accordance with this act." Wyo. Stat. Ann. § 4-10-801 (LexisNexis 2015) (emphasis added); *see also* Charles E. Rounds, Jr. & Charles E. Rounds, III, *Loring and Rounds: A Trustee's Handbook* § 6.1.2 , pp. 428-29 (2013 ed.) (noting court and academic rejection of notion that UTC benefit-the-beneficiaries rule erodes principle that settlor intent is paramount).

[¶59] Shriners contends that this Court's recent holding in *Forbes*, ¶ 28, 341 P.3d at 1052, that a trustee's duty of loyalty encompasses "a duty to the beneficiary to administer the trust solely in the interest of the beneficiary," is an acknowledgement that the beneficiary's interest must be considered to the exclusion of all other interests. We disagree. This Court's holding in *Forbes* was not limited to the general statements relied upon by Shriners. Our decision went on to explain that a trustee's duty of loyalty was aimed at deterring the trustee from temptation and the prohibited conduct was conduct such as self-dealing and conflicts of interest. *Forbes*, ¶¶ 58-59, 341 P.3d at 1058. The focus of our decision was not on the tension between settlor intent and beneficiary wishes, and in defining a trustee's duty of loyalty, we did not in any way deviate from the principle that settlor intent is paramount.

[¶60] Wyoming's jurisprudence has long reflected this "commitment to the protection of the settlor's intent." *Rock Springs Land and Timber, Inc. v. Lore*, 2003 WY 100, ¶ 30, 75 P.3d 614, 626 (Wyo. 2003) (citing *First Nat'l Bank and Trust Co. of Wyoming v. Brimmer*, 504 P.2d 1367, 1371 (Wyo.1973); *International Trust Co. v. Preston (Hicks' Estate)*, 156 P. 1128, 1132 (Wyo. 1916)). That we continue to adhere to this principle is reflected in our recent holdings:

> The clearly expressed intention of the settlor should be zealously guarded by the courts, particularly when the trust instrument reveals a careful and painstaking expression of the use and purposes to which the settlor's financial accumulations shall be devoted. A settlor must have assurance that his solemn arrangements and instructions will not be subject to the whim or suggested expediency of others after his death.

*Poland v. Nalee* (*In re Estate of George*), 2011 WY 157, ¶ 13, 265 P.3d 222, 225 (Wyo. 2011) (quoting *First Nat'l Bank & Trust Co.*, 504 P.2d 1367 at 1371 (Wyo. 1973)); *see also Meyer v. Miller*, 2014 WY 91, ¶ 19, 330 P.3d 263, 269 (Wyo. 2014) (quoting *Matter of Estate of Brosius*, 683 P.2d 663, 665 (Wyo. 1984)) ("We have often said that a testator [or settlor] who is legally qualified and who acts in accordance with the law has an absolute right to dispose of h[er] property after death as [s]he sees fit.").

[¶61] Thus, while we recognize that a beneficiary is entitled to the trustee's proper exercise of its fiduciary duty, our consideration of a breach of fiduciary claim is

"governed by the settlor's intent, not the beneficiaries' preferences." *Rock Springs Land and Timber, Inc.*, ¶ 25, 75 P.3d at 624.

## 2.    **Breach of Fiduciary Duty Allegations**

### a.    *First Northern Bank's Interpretation of Trust*

[¶62]  In its interpretation and administration of the Trust, First Northern Bank concluded that retention of the ranch until the year 2100 was one of the Trust's material purposes. Based on that interpretation, the Bank did not accede to Shriners' demand to sell the ranch and terminate the Trust.  Shriners contends that this was a violation of the Bank's fiduciary obligation to the Trust beneficiaries because "[t]he Bank had no good faith basis for its construction of the Trust and it acted unreasonably in construing the Trust." We find no error in the district court's rejection of this claim.

[¶63]  With respect to the reasonableness of the Bank's interpretation of the Trust, our decision confirms the Bank interpreted the Trust correctly, and, needless to say, we find nothing unreasonable in that interpretation.  With respect to the Bank's good faith basis for its interpretation, the record shows the Bank took appropriate steps before reaching its decision.  The Bank sought clarification of Mr. Cooksley's intent before his death and received confirmation from Mr. Cooksley's attorney that in fact it was his intention that the ranch be retained by the Trust until the year 2100 unless its sale was required for the limited reasons set forth in the Trust.  Additionally, the Bank's trust officer testified that she sought legal advice from the Bank's attorney in interpreting the Trust provisions and acted in accordance with that advice in making its decision to refuse sale of the ranch and termination of the Trust.  There is simply no basis to conclude that in interpreting the Trust, the Bank had any motivation other than its statutory duty to administer the Trust in accordance with the Trust terms or otherwise acted in bad faith.

### b.    *Bank's Failure to Diversify Investments*

[¶64]  Shriners contends that the district court erred in concluding that First Northern Bank was not required to sell the ranch to diversify the Trust's investments.  Given our conclusions above, we must again reject Shriners' claim.

[¶65]  Shriners' argument in support of this claim focuses solely on the rate of return the Trust earns by retention of the ranch and once again disregards entirely the Trust terms and the settlor's intent, contrary to our rules of interpreting and enforcing trusts.  As we discussed above, one of the Trust's material purposes is retention of the ranch until the year 2100, and the Trust specifically subordinates the beneficiaries' income distributions to maintenance of the ranch.  The beneficiaries' dissatisfaction with the income distributions does not provide a basis to override the settlor's intent.  As we explained in *American Nat'l  Bank*:

> \* \* \* It must be remembered that the grantor placed these assets in the trust, and did not distribute them directly to the beneficiaries. While the assets remain in the trust, the Trustee has an obligation to the trust and the grantor as well as to the beneficiaries.

*American Nat'l Bank*, 899 P.2d at 1341.

[¶66]  The trustee's obligation to diversify trust investments is not an obligation to be enforced in a vacuum, without regard to the settlor's intent.  As the district court observed:

> Finally, if it had been the Settlors' intention to benefit the charities over any other purpose, they could have included a provision, which outright donated the Ranch, restriction free, to Shriners and Kalif upon their deaths.  However, they did not do so.  They crafted provisions aligned with their desire to keep the ranch open, with any net income earned after the expenses to maintain the ranch had been paid, going to Shriners and Kalif.

[¶67]  We find no error in the district court's conclusion that First Northern Bank did not breach a fiduciary duty to diversify trust investments by rejecting Shriners' demands to sell the ranch or terminate the Trust.

### c.    *Agricultural Lease*

[¶68]  Shriners contends that First National Bank also breached its fiduciary duty to the beneficiaries by failing to renegotiate the agricultural lease Jack Cooksley had entered into for the lease of the ranch property and by including terms in a clarifying amendment that were less favorable to the Trust.  We again find no error in the district court's rejection of this claim.

[¶69]  In January 2008, Jack Cooksley, as trustee, entered into an agricultural lease of the ranch property with Dan Lawrence.  The lease was for a term ending on November 30, 2011.  Mr. Cooksley liked Mr. Lawrence's management of the ranch, and in November of 2010, he contacted his attorney and informed her that he and Mr. Lawrence had agreed to a five-year extension of the lease.  On January 28, 2011, Mr. Cooksley signed the lease extension, and on January 31, 2011, Mr. Lawrence signed the lease.

[¶70]  The lease extension contained a typographical error that was not caught by either signatory to the lease or Mr. Cooksley's attorney.  The lease extension stated the original

24

lease terminated November 30, 2010, when it actually ended November 30, 2011. The lease extension also provided a lease term of five years ending on November 30, 2015, but the lease payment provision provided for payments through November 1, 2016.

[¶71] After Mr. Cooksley's death, First Northern Bank's trust officer found the inconsistency in the lease and lease extension and contacted Mr. Cooksley's attorney and asked about the inconsistencies and about Mr. Cooksley's condition when he signed the lease extension. After talking with Mr. Cooksley's attorney, the trust officer believed Mr. Cooksley was competent to execute the lease extension and the errors in the lease extension were typographical errors. The trust officer then consulted with counsel, who prepared an amendment to correct the errors. On the advice of counsel, the trust officer did not attempt to renegotiate or change substantive lease terms and instead used the amendment to clarify terms.

[¶72] On June 2, 2011, First Northern Bank sent Shriners' attorney a copy of the proposed amendment to the lease extension, indicating the amendment was not yet executed. The Bank received no response from Shriners concerning the amendment. On June 13, 2011, the Bank and Mr. Lawrence executed the amendment.

[¶73] Shriners contends that the Bank breached its fiduciary duties by: 1) failing to negotiate more favorable lease terms that would have increased the payments to the Trust; 2) changing the lease renewal terms to require that Dan Lawrence be awarded a new lease if he so elected; and 3) by including property in the lease that had previously been excepted from the lease. The district court found no merit in these arguments, and we agree.

[¶74] With regard to renegotiating the lease terms, the lease was, as the district court found, a fully executed and enforceable contract. Shriners failed to present any basis on which the Bank could have simply ignored the lease and demanded new terms. In particular, Shriners presented no evidence that Dan Lawrence was willing to renegotiate the terms, and it presented no evidence that Jack Cooksley was pressured into executing the lease or was not competent to execute the lease. Mr. Cooksley's friend, John Piesik, testified to his concerns that Mr. Cooksley's use of pain medication diminished his capacity to understand his business dealings. Mr. Piesik also testified, however, that he did not see Mr. Cooksley on the date he executed the lease extension, and he further testified that if he were not present to witness Mr. Cooksley on a particular date, he would "have not a clue" as to Mr. Cooksley's capacity. Given that the lease was an enforceable contract, we cannot find a breach of fiduciary duty in the Bank's decision to abide by the lease terms.

[¶75] We turn then to the lease renewal term the Bank revised with its amendment to the lease extension. The amended term reads:

> Term of Lease. * * * In the event the Lessee desires to re-lease said real property and improvements, the parties shall negotiate, in good faith, regarding the renewal terms. The parties agree to enter into a new Agricultural Lease upon renewal.

[¶76] Shriners argues that the Bank breached its fiduciary duty in adding this term to the amended lease because it gives the lessee a guaranteed right to a new lease and precludes the trustee from negotiating with another party for more favorable terms. The district court disagreed, reasoning:

> Shriners interprets the wording that "[t]he parties agree to enter into a new Agricultural Lease upon renewal" to mean that the parties are bound to enter into a new lease regardless of how negotiations turn out. However, when this sentence is read in light of the surrounding language it becomes clear that the parties were agreeing that another Lease Extension was improper, and that if they were successful in their good faith negotiations, then they would enter into a new lease. The provision does not eliminate the ability of the Lessor to decline to re-lease the Ranch if the parties cannot agree on renewal terms. Therefore, these terms are not more favorable to Lessee and, as a result, [the Bank] did not breach its fiduciary duties by entering into the Amendment to Lease.

[¶77] Perhaps the last sentence of this term could have been worded more artfully to clarify its meaning, but we find the district court's interpretation reasonable. The provision promises good faith negotiations and nothing more, and the Bank did not breach its fiduciary duties by including this term in the lease amendment.

[¶78] We turn to Shriners' final claim regarding the amended lease, its claim that the Bank breached its fiduciary duties by giving lessee Dan Lawrence access to more of the property than was included in the lease extension negotiated by Jack Cooksley. This claim relates to terms in the lease extension that allowed Jack Cooksley to reside in and occupy the residence on the property and allowed him a nonexclusive right to hunt, fish, and otherwise recreate on the land. These provisions were personal to Mr. Cooksley and did not allow the Trust to separately lease the residence or generally allow the Trust nonexclusive hunting, fishing and recreation rights. Thus, when the Bank amended the lease after Mr. Cooksley's death, it left these terms out. This is not surprising. The Bank was simply removing lease provisions that no longer applied, and it plainly had good cause for omitting the terms. The exclusion of these terms was not a breach of the Bank's fiduciary duties.

26

[¶79] The Bank did not breach its fiduciary duties by not renegotiating settled lease terms or executing the amendment to clarify the lease terms.

### d.    Failure to Investigate Red Flags

[¶80] Shriners argues that the Bank breached its fiduciary duties by failing "to investigate the substantial red flags when the lessee and his attorney pushed an amended lease upon Jack [Cooksley] shortly before his death." Shriners expanded on this argument, with emphasis in the original:

> The Lease Extension was drafted by an attorney who represented both Jack and Mr. Lawrence and signed by Jack when he was extremely ill. Jack's signature is quite concerning, and the Lease Extension shows that Jack signed this document on January 31, 2011, but his signature was notarized *two days earlier* by the attorney who also represented Dan Lawrence.

[¶81] The record provides no support to Shriners' allegations. The agricultural lease and lease extension signed by Jack Cooksley both contain a conflict waiver provision. Darlene Reiter, Jack Cooksley's attorney, testified that she included the provision because of her representation of lessee Dan Lawrence in an unrelated matter approximately twenty-five years earlier. She further testified that with respect to the lease and lease extension, she represented and advised Jack Cooksley, not Dan Lawrence. Ms. Reiter also explained that she did not introduce Jack Cooksley and Dan Lawrence to each other, that it was Jack Cooksley who approached her to prepare the lease and lease extension, and that it was Jack Cooksley who provided the information and terms, including price, for both documents.

[¶82] With regard to execution of the lease extension, Ms. Reiter testified that Jack Cooksley was competent to sign the lease extension, that she went over the extension with him before he signed it, and that she was certain that he signed it on the date she notarized his signature, January 28, 2011. Ms. Reiter did not know how the lease extension ended up with a January 31, 2011 execution date, but she assumed Dan Lawrence filled in the date when he signed the extension because his signature was notarized by a different notary on the 31st.

[¶83] Shriners presented no evidence to contradict Darlen Reiter's testimony, and the record is equally unsupportive of Shriners' claim that First Northern Bank failed to closely examine and consider inconsistencies in the lease extension. Wendy Martin, one of the Bank's trust officers, reviewed the lease and lease extension following Jack Cooksley's death and found the errors in the termination dates. Ms. Martin then contacted Darlene Reiter and after talking with her concluded that the errors were

typographical and that Mr. Cooksley was competent to execute the lease extension. Ms. Martin also examined other documents it had on file that had been recently signed by Mr. Cooksley, including tax-related filings, and she consulted with the Bank's attorney. Based on this record, we find no error in the district court's conclusion that the Bank acted prudently in reviewing the lease extension, investigating the circumstances of its execution, and clarifying its terms.

[¶84] In a final shot at First Northern Bank, Shriners contends that the Bank should not have relied on Darlene Reiter's assurances of Jack Cooksley's competence because Ms. Reiter drafted the third amendment to the Trust, causing the Bank to have ethical concerns regarding her. The third amendment revised the property distribution provisions of section 2.2 to provide:

> C. Piesik and Reiter shall make distribution or disposition of all other tangible personal property in the residence as Piesik and Reiter, in their sole discretion, shall deem appropriate, including but not limited to private sale, auction, gift, charitable donation or other disposition. I intend that Piesik and Reiter shall have full discretion to carry out my wishes, which I have discussed with both of them. I intend that the trust continue for some years, and direct Piesik and Reiter to dispose of tangible personal property so that it is not a burden on the trust. Piesik and Reiter may exercise their judgment to select items of historical or aesthetic value that can be preserved, protected and/or made available for reference; to make gifts to my friends and neighbors; to sell items; and to otherwise dispose of such property as they deem appropriate. It is entirely at their discretion whether to donate, gift or sell items. By way of example, I have daily journals dating from circa 1960, and I have discussed with Piesik and Reiter that if the Wyoming Room of the Sheridan County Fulmer Public Library was interested in receiving them, that would be a satisfactory disposition of the diaries.
>
> * * * *
>
> F. I instruct my Trustee to pay the reasonable costs of valuation secured by Piesik and Reiter as provided above, and to further pay reasonable compensation to and costs incurred by Piesik and Reiter in performing the actions necessary to dispose of the tangible personal property in my residence. In the event that such property is sold, I direct Piesik and Reiter to collect the net proceeds therefrom and to submit same to my Trustee at such time as the dispositions are completed. I do not intend by this provision to imply that

28

Piesik and Reiter must sell any items; it is entirely at their discretion whether to gift, donate, discard or otherwise dispose of the tangible personal property in my home. They know my wishes and will fulfill my intent, taking into consideration the circumstances extant at the time of disposition. In the event that neither Piesik nor Reiter is able or willing to serve as provided herein, the[n] I authorize my Trustee to make such dispositions as it, in its discretion, deems appropriate to the guidelines provided herein.

[¶85] Shriners' expressed concerns to the Bank regarding the amendment and suggested that Ms. Reiter had violated the Rules of Professional Conduct by drafting an amendment that gave John Piesik and her possession and control over Trust property. The Bank responded by consulting with its attorney and having Ms. Reiter and Mr. Piesik execute bills of sale signing the property over to the Bank as trustee. Wendy Martin, the Bank's trust officer, did not express concerns with Ms. Reiter's ethical values. Asked whether she thought the amendment was a potential problem, she testified, "We were not sure[.]" It is thus something of a stretch to challenge the Bank's reliance on Ms. Reiter's assurances based on alleged ethical concerns of the Bank. Additionally, while the third amendment could have been better crafted to clarify that possession of the property was being made solely for purposes of gifting or sales to benefit the Trust, we do not see the amendment as evidence of the type of nefarious self-dealing Shriners has insinuated throughout its allegations.

[¶86] We find no violation of the Bank's fiduciary duties in its consideration of the lease extension and circumstances surrounding the lease.

## D.    Removal of Trustee

[¶87] Shriners next contends that the district court erred in denying Shriners' request that First Northern Bank be removed as trustee. Shriners argues first that the district court applied the wrong standard for removal when the court used statutory standards rather than the "good cause" standard provided in the Trust. It further argues that the court erred in not finding grounds for removal. We will address first the applicable standard governing the removal request and then review the district court's decision based on that standard and the grounds alleged for removal.

## 1.    Removal Standard

[¶88] Section 5.2 of the Trust governs resignation, removal, and appointment of trustees. It provides, in part:

A trustee may resign at any time by giving written notice, specifying the effective date of the resignation, to the income beneficiary or beneficiaries of the trust. Settlor **ALFRED J. COOKSLEY** may remove any Trustee or may add Trustees. After the death of Settlor **ALFRED J. COOKSLEY**, the income beneficiary may remove a Trustee acting hereunder, if for good cause, and may appoint a suitable, independent, corporate successor Trustee[.]

[¶89] Shriners contends that the good cause standard was included in the Trust to ease the showing a beneficiary must make to support removal and was included to provide for removal outside the removal standards prescribed by law. Shriners further contends that good cause is merely the opposite of no cause and means any cause so long as the beneficiary has a reason for the trustee's removal. We disagree.

[¶90] When we interpret a trust instrument, we consider the document as a whole and read its provisions together. *Evans*, ¶ 21, 282 P.3d at 1210. We also presume that parties to the trust know the law and contract with reference to that law. *Garwood v. Garwood*, 2008 WY 129, ¶ 21, 194 P.3d 319, 327 (Wyo. 2008). This presumption is particularly appropriate here because the Trust specifically incorporates Wyoming law. Section 3.1 of the Trust provides:

The Trustee may exercise those powers set forth in, and subject to any limitations in, any and all Wyoming statutes applicable to Trustees and Fiduciaries. These statutes are incorporated by reference as if they were set out at length here. All the general powers granted to the Trustee and all limitations upon any powers are subject to any express contrary directions in this [Trust].

[¶91] Similarly, Section 5.4 provides:

The validity, construction and administration of this [Trust] and any trust created by it, and all questions concerning any power of appointment granted by this [Trust] and the exercise of any power, shall be determined by reference to the laws of the State of Wyoming[.]

[¶92] Given that Wyoming law is expressly incorporated into the Trust to define the trustee's powers, obligations, and limitations, we find it unreasonable to interpret section 5.2's "good cause" standard to be the amorphous standard urged by Shriners. We find it much more likely that the "good cause" language was included, not to distinguish the removal standard from the standard prescribed by Wyoming law, but rather to distinguish

it from the standard applicable to the settlor's power to remove a trustee. Section 5.2 allows the settlor to "remove any Trustee," with no qualification of that power. The next sentence sets forth the beneficiary's power to remove a trustee, and it qualifies that power, specifying that removal must be "for good cause." Reading the Trust as a whole and giving effect to all its terms, we must conclude that "good cause" for a beneficiary's removal of a trustee means the removal standard set by Wyoming law.

[¶93] Under the Uniform Trust Code, cause for removal of a trustee includes a breach of fiduciary duties. Wyo. Stat. Ann. § 4-10-1001(b)(vii) (LexisNexis 2015). It also includes:

> (i) The trustee has committed a serious breach of trust;
>
> (ii) Lack of cooperation among cotrustees substantially impairs the administration of the trust;
>
> (iii) Because of unfitness, unwillingness or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries; or
>
> (iv) There has been a substantial change of circumstances, or removal is requested by all of the qualified beneficiaries, and the court finds that removal of the trustee best serves the interests of all of the beneficiaries and is not inconsistent with a material purpose of the trust, and a suitable cotrustee or successor trustee is available.

Wyo. Stat. Ann. § 4-10-706(b) (LexisNexis 2015).

[¶94] This Court has recognized other grounds for removal:

> Trustees may be removed for a variety of grounds, ranging from habitual drunkenness to tax evasion, to disobedience of directions in the trust instrument. Bogert, *supra*, § 527. "Mismanagement of the estate arising from a misconception or misunderstanding of the trustee's duties may be a ground for removal, but not if no serious harm has been done and no dishonesty or want of capacity is indicated. Similarly, a mere error in judgment is insufficient." *Id*. at 67–69.

*Forbes*, ¶ 32, 341 P.3d at 1052-53.

[¶95] Regarding hostility between a trustee and a beneficiary as grounds to remove a trustee, we have said:

> Hostility may naturally exist in trust relationships since trusts are usually created to withhold control of the trust principal from the beneficiaries. Hostility between the trustee and the beneficiaries of the trust alone is insufficient to require the removal of the trustee. To be sufficient to require removal, the hostility must interfere with the proper administration of the trust.

*Forbes*, ¶ 96, 341 P.3d at 1065 (quoting *In re Trust Created by Hill for benefit of Schroll*, 499 N.W.2d 475, 485 (Minn.Ct.App. 1993)).

## 2.    Review of District Court Decision

[¶96] We review a district court's decision whether to remove a trustee for an abuse of discretion:

> The district court's power to remove a trustee is "rooted in equity," *Kerper*, 780 P.2d at 938 (citing Wyo. Stat. Ann. § 2–3–210), and the court has "sound discretion" to make the determination whether to remove a trustee, which we will not disturb absent an abuse of discretion. *Id*.

*Forbes*, ¶ 33, 341 P.3d at 1053.

[¶97] We have also recognized that "[c]ourts are more reluctant to remove a trustee who has been chosen by the settlor than one who is court-appointed." *Forbes*, ¶ 30, 341 P.3d at 1052 (quoting Bogert, *The Law of Trusts and Trustees* § 527, at 51–52 (2d ed.1978)). When the removal is of a settlor-appointed trustee we have required an enhanced showing to justify removal:

> As we have seen the removal of an executor or trustee is harsh and severe; it is serious; it is a drastic action; it should not be done unless clearly necessary; if the court can adjust the disputed matters, the removal should not be made; an executor or trustee should not be removed except for gross and willful misconduct.

*Forbes*, ¶ 29, 341 P.3d at 1052 (quoting *In re Hartt Estate*, 75 Wyo. 305, 295 P.2d 985, 1011 (1956)).

32

[¶98] Shriners has failed to make the showing required to justify removal of First Northern Bank as trustee.  Shriners has not shown a breach of fiduciary duties, a conflict of interest, self-dealing of any sort, or any type of gross and willful misconduct by the Bank.  We do not doubt a certain amount of hostility exists between Shriners and the Bank, but Shriners has not shown that the hostility has interfered with the Bank's administration of the Trust.  Indeed, although Shriners is not receiving as great a benefit as it would if the ranch were sold outright, the record shows the Bank has administered the Trust in keeping with its terms and material purposes and that, since Mr. Cooksley's death, the Bank has made distributions to Shriners totaling $69,016.24, and distributions to Kalif totaling $12,179.34.  We therefore find no abuse of discretion in the district court's decision to deny Shriners' request to remove the Bank as trustee.

**E.      Findings Related to Actions of Bank's Attorney**

[¶99] First Northern Bank's attorney, Tonia Hanson, initially responded to Shriners' allegation that the Trust violated the rule against perpetuities by filing a petition to amend the Trust to conform to the rule.  On further reflection, the Bank's attorney changed the Bank's position and asked the district court to find that the Trust was a charitable trust and the rule therefore did not apply.  Shriners included a claim in its complaint that payment of attorney fees associated with this change of position was a waste of Trust assets, which the district court rejected.  Shriners contends on appeal that the district court's findings, specifically its findings relating to the attorney's concerns and thought process, were unsupported by the record because the attorney did not testify.

[¶100] The sole challenge Shriners makes to the district court's rejection of this particular waste claim is to the court's findings relating to the attorney's reasons for filing the petition to amend and then changing course on the rule against perpetuities question.  In our review of the record, we find ample support for the court's findings in letters written by the Bank's attorney, testimony from one of the Bank's trust officers, and the motion to amend the petition itself.  We therefore find no clear error in the district court's findings.

**F.      Attorney Fees Award**

[¶101] The district court ordered Shriners to pay the attorney fees and costs incurred by Tom Toner of Yonkee & Toner, LLP, on behalf of First Northern Bank in the amount of $48,343.74.  This amount included $1,000.00 incurred to retain an expert whose testimony the Bank ultimately did not use at trial.  On appeal, Shriners asserts two errors in the award of fees and costs.  It contends that the $1,000.00 award for expert fees was a mistake, and it contends that the district court erred in requiring Shriners to pay the fees and costs rather than having those fees and costs paid by the Trust.

[¶102] We review an award of attorney fees and costs as follows:

The question of whether there is legal authority to award attorney fees is one of law, which we review *de novo*. *See*, *Thorkildsen v. Belden*, 2011 WY 26, ¶ 8, 247 P.3d 60, 62 (Wyo.2011); *Ultra Resources, Inc. v. Hartman*, 2010 WY 36, ¶ 149, 226 P.3d 889, 935 (Wyo.2010); *Breitenstine v. Breitenstine*, 2006 WY 48, ¶ 12, 132 P.3d 189, 193 (Wyo.2006). The final attorney fee award is, however, reviewed for abuse of discretion. *Mueller v. Zimmer*, 2007 WY 195, ¶ 11, 173 P.3d 361, 364 (Wyo.2007).

*Evans*, ¶ 37, 282 P.3d at 1214.

## 1.    Expert Fees

[¶103] Shriners challenges the $1,000.00 award for expert fees as a mistake or oversight by the district court and requests a remand to correct this portion of the award. It bases this argument on the district court's denial of expert fees paid in conjunction with legal fees for counsel retained by the Bank's insurer. Specifically, the district court ruled:

> * * * [T]his Court does not believe that Shriners should be responsible for any attorney's fees other than those incurred by Toner. The Court is persuaded by Shriners' argument that justice and equity do not require Shriners to reimburse FNB, or its insurance company, for the fees incurred by attorneys hired by FNB's insurance company. The insurance company hired multiple attorneys to represent FNB against the damages claims in this case (not to assist in defending the Trust). * * * [T]he insurance company's decision to hire counsel for FNB, and change counsel more than once resulted in multiple attorneys duplicating effort without actually trying the case. This resulted in more fees being incurred than was practical or necessary. Additionally, none of the fees incurred by the attorneys hired by the insurance company were for the purpose of defending the Trust itself. The insurance company was merely concerned about protecting the interests of FNB. * * *
>
> This Court is further persuaded by Shriners' argument that it would not be just and equitable to require it to bear the cost of FNB's expert fees when it was FNB who changed positions before the trial arguing that experts should not be allowed to testify at trial. FNB ultimately decided to

34

eliminate its own expert from the trial phase, and for this reason Shriners should not be responsible for those fees.

[¶104] The Bank's insurer paid $11,700.00 in expert witness fees, which were denied. Tom Toner paid $1,000.00 to retain the expert, which was included in the $48,343.74 awarded by the district court. Mr. Toner's affidavit in support of his fee application stated:

> 5. I represented the Defendant First Northern Bank of Wyoming in this case. Multiple attorneys were involved in the defense of this case because The Kansas Bankers Surety Company would defend only the Plaintiff's damage claim against the Bank and would not provide counsel to defend the Plaintiff's claims that the trust should be terminated, that the bank should be required to sell the Cooksley Ranch and that the Bank should be removed as trustee. * * * I was not paid by the insurer for the work I did in this case.
>
> * * * *
>
> 11. Shriners designated William Welch, a retired trust officer and a Colorado attorney, as an expert witness. This made it necessary to employ an expert to counter the testimony of Mr. Welch, if Mr. Welch was allowed to testify to all of the opinions set out in his expert designation. I hired Robert Wyatt, a Wyoming attorney and former trust officer, as an expert on behalf of the Bank and worked with Mr. Wyatt in the preparation of his expert designation to be filed with the Court in case his testimony was required.

[¶105] The $1,000.00 Tom Toner paid to retain the expert witness was related to Mr. Toner's defense of the Trust and the Bank as trustee. Additionally, the fee was paid well before any decision could be made to proceed at trial without an expert. In short, the expert fee is more in keeping with the fees the district court found should be awarded and less like those it found should be denied. We therefore find no mistake in the award and decline Shriners' request for a remand to correct the award.

## 2. Requirement that Shriners Pay Fee Award

[¶106] Shriners contends that the fees and costs incurred by First Northern Bank should have been ordered paid from the Trust and the district court abused its discretion in requiring Shriners to pay the award. We again disagree.

[¶107] The Uniform Trust Code authorizes the payment of attorney fees and costs as follows:

In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

Wyo. Stat. Ann. § 4-10-1004 (LexisNexis 2015).

[¶108] We have addressed the district court's discretion in making a "justice and equity" determination under this provision of the Code. We explained:

> Once it has been determined that authority exists to award fees and costs, a trial court has extremely broad discretion to rule on the amount of such an award. *KC*, 941 P.2d at 53; *Haltom v. Haltom*, 755 P.2d 876, 879–80 (Wyo.1988). In reviewing the district court's determination of the amount, if any, to award the Trustees in this case, we are mindful that we have held that we will not interfere with the trial court's exercise of discretion in making such an award except upon proof that such discretion was gravely abused. *See KC*, 941 P.2d at 53; *Haltom*, 755 P.2d at 879–80.
>
> Courts interpreting provisions identical or similar to § 4–10–1004 have observed that the provision's use of the phrase "justice and equity" must guide a trial court's discretion in determining whether to award fees from a trust and the amount of any fees awarded. *See*, *e.g.*, *Atwood*, 25 P.3d at 947. The Oklahoma court in *Atwood* described the inquiry as follows:
>
>> The highly subjective phrase "justice and equity" does not state specific guidelines or criteria for use by a trial court or for use by a reviewing court. The phrase connotes fairness and invites flexibility in order to arrive at what is fair on a case by case basis. Hence, general criteria drawn from other types of cases provide nonexclusive guides. These include (a) reasonableness of the parties' claims, contentions, or defenses; (b) unnecessarily prolonging litigation; (c) relative ability to bear the financial burden; (d) result obtained by the litigation and prevailing party concepts; and (e) whether a party has acted in bad faith, vexatiously,

36

wantonly, or for oppressive reasons in the bringing or conduct of the litigation.

The role of "justice and equity" in this phase of the inquiry before the trial court is distinct from their role in determining what amount of costs, fees, and expenses should be allowed. For example, the fact that the nature of the case was difficult and required a great deal of effort goes to the amount of the award rather than whether an award should be granted.

*Atwood*, 25 P.3d at 947; *see also Whittlesey v. Aiello*, 104 Cal.App.4th 1221, 128 Cal.Rptr.2d 742, 748 (2002) (no basis for trustee to recover litigation expenses if litigation does not benefit trust); *Nickas*, 954 S.W.2d at 741 (award of litigation expenses authorized only to the extent litigation found beneficial to trust).

*Garwood v. Garwood*, 2010 WY 91, ¶¶ 38-39, 233 P.3d 977, 986 (Wyo. 2010).

[¶109] The district court found that justice and equity required that Shriners pay the award of fees and costs. It reasoned:

An analysis of the results obtained by the litigation and the prevailing party's concepts yields the conclusion that FNB should be entitled to the reasonable attorney's fees incurred as a result of defending the Trust. At trial, this court found in favor of FNB, holding that FNB correctly determined the material charitable purpose of the Trust was to keep the ranch land open for agricultural purposes. As a result of this finding, the Court held that FNB did not act imprudently in its administration of the Trust by managing the Trust in a manner that was consistent with the material purpose. The Court's ruling was premised on the fact that the Settlor desired the land to be used for agricultural purposes until the year 2100, and terminating the Trust would be in direct contravention of that stated intent. The Settlor described in the First Amendment to the Trust, and reiterated in each following Amendment that "it is our intention that the Trustee continue to hold the ranch for the terms of this trust, with the land remaining open and its use devoted to agriculture and/or preservation." FNB, acting as trustee, not

only administered the trust to continue the life of the Trust, but also defended the Trust against claims that the ranch should be sold. Both of these actions were exactly what the Trust document demanded.

After analyzing the next guideline, which is whether a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons in the bringing or conduct of litigation, again the Court finds that FNB is entitled to the reasonable attorney's fees incurred as a result of defending the Trust. Shriners sought to have the trust terminated, and fought to have the ranch sold so that it could realize the benefits of that sale and obtain its gift years before that gift came to fruition. Shriners' arguments that the Settlor intended to confer the best benefit possible to the beneficiaries completely ignored the expressed desires of the man who was so generous as to bequeath Shriners with a charitable contribution. Because Shriners tried to terminate the Trust and sell the ranch against the wishes of the settlor, it can be said Shriners acted in bad faith.

\* \* \* \*

In sum, the outcome in the trial, coupled with Shriners bad faith arguments warrants an award of attorney's fees to FNB for the reasonable fees it incurred in defending the Trust. Toner was the attorney retained by FNB to defend the trust and justice and equity demand Shriners pay for those fees.

[¶110] We agree with the district court's observation that Shriners' actions against the Bank and the Trust were taken with utter disregard for the Cooksleys' intentions, a position contrary to the paramount importance Wyoming law places on a settler's intentions. We therefore find no abuse of discretion in the district court's determination that Shriners should be responsible for payment of the attorney fees and costs awarded in this matter.

## G.     Attorney Fees and Costs on Appeal

[¶111] The final question we address is whether First Northern Bank is entitled to an award of attorney fees and costs associated with this appeal. In accordance with Wyo. Stat. Ann. § 4-10-1004, the Bank is entitled to an award of fees and costs incurred on appeal. For the same reasons stated above, the award shall be paid by Shriners. First Northern Bank may file a motion for the award of fees and costs in accordance with Rule 10.06 of the Wyoming Rules of Appellate Procedure.

# CONCLUSION

[¶112] We affirm the district court's ruling that the Trust does not violate the rule against perpetuities, though on different grounds from the district court ruling. We also affirm the district court's judgment denying Shriners' claims against First Northern Bank and its order awarding attorney fees and costs. First Northern Bank may file a motion for an award of attorney fees and costs incurred on appeal in accordance with W.R.A.P. 10.06.