# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 59

APRIL TERM, A.D. 2022

May 12, 2022

WALDO E. FORBES,

Appellant
(Plaintiff),

v.

WILLIAM C. FORBES; JULIA FORBES;
EDITH L. FORBES and DONALD C.
BINGHAM, individually and in their
capacity as Trustees of the Beckton Ranch
Trust U/A/D April 1, 1920,

Appellees
(Defendants).

S-21-0159

*Appeal from the District Court of Sheridan County*
*The Honorable John Fenn, Judge*

*Representing Appellant:*
Mitchell H. Edwards, Nicholas & Tangeman, LLC, Laramie, Wyoming. Argument
by Mr. Edwards.

*Representing Appellee William C. Forbes:*
Timothy S. Tarver, Tarver, Kerns & Bunting, Sheridan, Wyoming. Argument by
Mr. Tarver.

*Representing Appellees Julia Forbes, Edith L. Forbes, and Donald C. Bingham:*
Thomas N. Long and Justin A. Daraie, Long Reimer Winegar LLP, Jackson,
Wyoming. Argument by Mr. Daraie.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, JJ., and OVERFIELD, D.J.*

*OVERFIELD, D.J., delivers the opinion of the Court; KAUTZ, J., files an opinion concurring
in part and dissenting in part.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**OVERFIELD, District Judge.**

[¶1]     In January 2018, Waldo E. Forbes (Spike)[1] gifted his shares in the Beckton Ranch Trust (BRT) to two of his stepsons.  The current trustees of the BRT, William C. Forbes (Cam), Julia Forbes, Edith L. Forbes, and Donald C. Bingham (collectively Trustees), chose to exercise an option within the trust instrument to reacquire Spike's gifted shares at "fair value."  The Trustees appraised the "fair value" of the shares through a sealed bidding process between the beneficiaries of the BRT.  Under the terms of the BRT, the Trustees are also beneficiaries.  At the end of the sealed bidding process, several beneficiaries purchased the shares for their "fair value," including Trustee Edith who purchased one share.  Spike disputed the Trustees' method for appraising the "fair value" of the shares and filed a complaint against the Trustees seeking declaratory judgment, damages for breach of fiduciary duty, and an accounting.

[¶2]     Following a hearing on several dispositive motions, the district court found Spike did not have standing to seek declaratory relief as it related to the value of the gifted shares. The district court also found the Trustees did not breach their duty of loyalty but had rendered an inadequate accounting.  The Trustees subsequently filed a new accounting, which the district court found to be sufficient.  Spike challenges the district court's findings on appeal.  We affirm in part, reverse in part.

## *ISSUES*

[¶3]     We state the issues as follows:

> 1.    Whether the district court erred when it held Spike did not have standing under the Uniform Declaratory Judgments Act?
>
> 2.    Whether the district court erred in granting summary judgment in favor of the Trustees finding no breach of the fiduciary duty of loyalty?
>
> 3.    Whether the district court erred in finding the BRT's 2019 Annual Report satisfied all the requirements for a common law accounting?

---

[1] To avoid confusion, the Court will refer to the members of the Forbes family by their first names or family nicknames.

1

## *FACTS*

[¶4] We previously discussed the history and details of the BRT in *Forbes v. Forbes*, 2015 WY 13, 341 P.3d 1041 (Wyo. 2015). The BRT is now set to terminate on August 31, 2036. At the time this matter was before the district court, the BRT had 21 beneficiaries, which included Spike and the Trustees, and 1,188 outstanding shares.

[¶5] After Spike filed the litigation resulting in *Forbes*, the Trustees began issuing annual reports outlining the affairs and assets of the BRT. The Trustees have also issued supplemental reports for any extraordinary transactions that occurred during a given year. The annual reports contained information on the BRT's finances, the status of various lease agreements, and identified the shareholders and number of shares held.

[¶6] The current dispute began in January 2018 when Spike gifted one share to his son-in-law Jeff Durkin, two shares to his stepson Geoffrey Scott, and two shares to his stepson Jeremy Scott. In February 2018, Spike wrote a letter to the Trustees informing them of his gift to Jeff Durkin and his belief that, based on the annual reports, the value of a single BRT share was $21,600. Additionally, in March 2018, Spike attempted to gift five shares to the Sheridan College Foundation. Then in June 2018, Spike informed the Trustees of the gifts to his stepsons.

[¶7] Under Article Twelfth of the BRT, trustees are given the option to purchase shares held by non-descendants of William Hathaway Forbes at "fair value." Article Twelfth states:

> TWELFTH – If at any time any person who is not a descendant of William Hathaway Forbes, late of Milton aforesaid, and who is not the widower or widow of such a descendant shall acquire whether by devise or purchase or otherwise any interest in the trust estate, any such person shall give notice in writing to two or more of the trustees that he has so acquired an interest, stating in such notice the nature and extent thereof. As soon as such interest is so acquired **the trustees shall have an option to purchase the same at its fair value and shall have power to appraise said interest and determine the value thereof, such appraisal to be binding and conclusive**. Said option may be exercised at any time within a period ending three months after the trustee last notified receives his written notice or six months after said interest is so acquired, whichever is the later date. If the trustees elect to exercise their option to buy such interest they shall within the period aforesaid give notice in writing to such person of such election and of the value which they have fixed

2

and he shall thereupon become bound to convey his interest as aforesaid to the trustees in return for the payment of said value. After purchase they shall hold in trust said interest to sell and convey the same in their discretion to any person or persons descended from William Hathaway Forbes as aforesaid or the widower or widow of any such descendent.

(Emphasis added.)

[¶8]  Pursuant to Article Twelfth, the Trustees decided to exercise their option to purchase the shares Spike gifted to the Scotts.[2]  On June 29, 2018, the Trustees notified the Scotts they would be exercising their option to purchase the shares.  Within the written notice, the Trustees stated the shares' fair value would be determined through a sealed bidding process.

[¶9]  The Trustees decided the sealed bidding process would be the most adequate way to appraise the fair value of the BRT shares.  In this process, each of the current and past adult beneficiaries of the BRT would be given the opportunity to bid on the shares.  The Trustees felt the confidential nature of the process would hide the identity of the bidders and force each bidder to bid the highest price he or she would be willing to pay for the shares.  The Trustees also felt the sealed bidding process would inform them about how much they could fairly spend recovering the shares without the BRT losing money.

[¶10]  On July 5, 2018, the Trustees sent a request for bids to the current and past adult beneficiaries of the BRT, which included Spike and his biological children.  The request for bids stated:

> The trustees have concluded that the fair value of the BRT shares can best be thought of as the price that a knowledgeable, financially unrelated party would pay for the shares, taking into account factors such as the life of the trust, liquidity of the investment, potential for appreciation or depreciation, potential to produce income, and other potential risks and benefits, etc.

[¶11]  The request for bids also stated:

> Because the shares that are to be sold were conveyed by Spike to Geoffrey and Jeremy by gift or sale, any bid from Spike, or from either of his two children (who are considered to be

---

[2] The Trustees did not exercise their option against Jeff Durkin's share because he is married to a descendant of William Hathaway Forbes.

3

financially related to Spike) would be seen as a simple buy-back to return the shares to their original owner or his direct heirs, and would therefore not be used as part of the determination of the fair value. The fair value will therefore be calculated as follows:

1. If Spike Forbes and his children are not winning bidders, then the fair value per share will be the sum of payments received by the BRT from the winning bidders, divided by four.

2. If Spike Forbes or either of his children are winning bidders, then the fair value per share will be the sum of payments that would have been received by the BRT from the bidders who would have won the right to purchase the shares had Spike and his children not participated in the bidding process.

[¶12] The Trustees stated in the request that a minimum bid price was set at $4,000 per share. The request indicated the minimum bid price did not reflect the Trustees' opinion on the "fair value" of each share. Bidders were required to delineate the price per share and how many shares they were willing to purchase at the per-share price. The request also required any bids to be sent to the BRT's certified public accountant by noon on July 27, 2018.

[¶13] After the request for bids was sent out to the beneficiaries, the Trustees received notice of Spike's gift of five BRT shares to the Sheridan College Foundation. The Trustees believed the gift to have been accepted and chose to exercise their option under Article Twelfth to purchase the gifted shares. The Trustees then sent out a revised request for bids indicating the total number of available shares had increased to nine. Because the Trustees were also beneficiaries who intended to bid, the Trustees established rules in the revised request for bids to disadvantage themselves in the bidding process. For instance, the revised request stated, "[i]n the event that the per-share price offered by a trustee bidder and a non-trustee bidder are equal then the bid submitted by the non-trustee bidder will be given first priority."

[¶14] On July 10, 2018, Cam delivered a letter to the Sheridan College Foundation explaining the Trustees' decision to exercise their option under the terms of the trust to reacquire the shares gifted to it. The letter stated the BRT would purchase the shares at $4,000 per share, which represented a discount valuation from the original value of the underlying trust assets. The Trustees explained the discount was appropriate because of the BRT's termination date in 2036, the uncertainty of the value of the land and related assets, the assets generated very little income, and there was a limited market for the shares

4

due to restrictions on ownership set out in the trust agreement. The Trustees tendered a check for $20,000 to the Sheridan College Foundation along with the letter. The letter and the check were sent prior to the Trustees' "fair value" determination at the completion of the sealed bidding process.

[¶15] By the July 27, 2018 deadline, the CPA received a total of seven bids. Neither Spike nor his biological children submitted any bids. The initial results of the sealed bidding process were as follows:

    a. Sarah Forbes Trust – Four shares at $4,005 each;
    b. Donald Bingham – Nine shares at $5,950 each;
    c. Lindsey "Shelley" Forbes – One share at $4,150;
    d. Stephen Forbes – Five shares at $4,100 each;
    e. Natalie "Tallie" Forbes – One share at $4,300;
    f. Edith Forbes – Four shares at $6,000 each; and
    g. Cam Forbes – Three shares at $4,051 each.

[¶16] After reviewing the above bids, the Trustees determined the fair value for all nine shares would be $53,750. The Trustees reached this value using Edith's bid of $6,000 a piece for four shares ($24,000) and Donald's bid of $5,950 a piece for the remaining five shares ($29,750) and dividing the number by nine. The result was a value of $5,972.22 per share.

[¶17] The request for bids contained a provision stating if any winning bidder won two or more shares, the unsuccessful bidders would be given the opportunity to match the winning bid. Since Edith and Donald had offered to purchase two or more shares, the Trustees notified the unsuccessful bidders of the results and provided them the opportunity to match the winning bids. Stephen and Tallie both decided to match Edith's bid of $6,000 for one share each, and Shelley matched Donald's bid of $5,950 for one share.

[¶18] On August 1, 2018, the Trustees tendered a second check to the Sheridan College Foundation for $9,861.10, which accounted for the difference between the $4,000 per share previously offered by the Trustees and the amount of the winning bids that had established the value of $5,972.22 per share. The Trustees also notified the Scotts of the winning bid value and sent each of them a check for $11,944.44.

[¶19] On August 8, 2018, the Sheridan College Foundation rejected Spike's gift of BRT shares and returned the two checks tendered to it. The Trustees sent a letter to the Foundation asking for them to reconsider the gift. The Foundation affirmed its rejection.

[¶20] The Sheridan College Foundation's rejection of Spike's shares complicated the allocation of shares among the successful bidders since the total number of purchasable

shares was reduced from nine to four. To resolve this issue, Edith agreed to release her bid for one of the shares and Donald agreed to release his bid on all four shares.

[¶21] The final result of the bidding process was Edith, Stephen, and Tallie each paying $6,000 for their respective shares and Shelley paying $5,950 for her share. The total amount the BRT received for all four shares was $23,950. Both the Scotts sent letters to the Trustees disagreeing with the value of the shares but indicated they nonetheless cashed the checks tendered to them. The Trustees responded to the two letters stating they could not pay more than the amount the BRT would receive from reselling the shares to eligible shareholders. The Trustees explained that doing so would result in a diminution of trust assets. The letters also stated the Trustees' belief that "[t]he fairest and most accurate way to appraise the value of any asset is to use the actual price that knowledgeable and eligible buyers will pay for it."

[¶22] On January 14, 2019, Spike filed a complaint seeking declaratory relief from the Trustees' valuation of the gifted shares and alleged the Trustees breached their fiduciary duty of loyalty. Spike also sought damages for the Trustees' alleged breaches and an accounting.

[¶23] On October 9, 2019, the Trustees filed a motion for judgment on the pleadings. Cam, as a separate party, filed a motion for joinder on the motion for judgment on the pleadings. Spike opposed both motions. On November 4, 2019, before the district court ruled on the motions, Spike filed a motion for summary judgment. On November 21, 2019, Cam filed a cross-motion for summary judgment. The remaining Trustees then filed a motion opposing Spike's motion for summary judgment and supporting Cam's cross-motion for summary judgment. On January 27, 2020, the district court held a hearing on the motions.

[¶24] In its written order filed on March 24, 2020, the district court found Spike did not present a justiciable controversy in his requests for declaratory relief. The district court first found Spike lacked standing to litigate the transactions over the Scotts' shares. The district court reasoned Spike, at best, articulated a speculative harm because he no longer owned the shares and any damages related to the shares would be payable to the Scotts, not Spike. The district court also found Spike's remaining requests for declaratory relief were contingent on whether Spike would gift shares to non-descendants of William Hathaway Forbes and whether the Trustees would exercise their option under Article Twelfth. The district court asserted Spike was attempting to adjudicate the rights of unknown third parties—potential future donees—and was ultimately seeking an advisory opinion. The district court concluded that because a justiciable controversy was not present, it did not have jurisdiction under the Uniform Declaratory Judgments Act.

[¶25] After disposing of Spike's requests for declaratory judgment, the district court nonetheless went on to find that under the terms of the BRT, the Trustees had not breached

their fiduciary duty of loyalty by using the sealed bidding process as a method to appraise the "fair value" of BRT shares. Further, the district court determined the Trustees did not engage in impermissible self-dealing because the Trustees took steps to disadvantage themselves in the bidding process, all past and current beneficiaries were allowed to bid, and the terms of the BRT allowed the Trustees to purchase the shares.

[¶26] The district court also found the Trustees' 2018 Annual Report failed to provide a sufficient accounting because the report did not contain complete and accurate information as to the nature and amount of the trust property. The district court set the matter for a bench trial which was continued due to the coronavirus pandemic. On June 19, 2020, the Trustees sent out the 2019 Annual Report and were ordered to file it with the court after a status conference was held. Both parties filed memorandums supporting or objecting to the report. Another status conference was held on February 9, 2021. The parties agreed no evidentiary hearing was necessary and the court could determine the sufficiency of the report based solely on the record. On April 7, 2021, the district court found the 2019 Annual Report contained sufficient information to satisfy the common law requirements for an accounting.

[¶27] Spike now challenges the district court's findings on appeal.

### STANDARD OF REVIEW

[¶28] The district court concluded Spike lacked standing to seek relief under the Uniform Declaratory Judgments Act. Whether a party has standing involves questions of justiciability, which are reviewed de novo. *Skaf v. Wyoming Cardiopulmonary Servs., P.C.*, 2021 WY 105, ¶ 11, 495 P.3d 887, 892 (Wyo. 2021) (quoting *In re Est. of Johnson*, 2010 WY 63, ¶ 4, 231 P.3d 873, 876 (Wyo. 2010)); *Allred v. Bebout*, 2018 WY 8, ¶ 29, 409 P.3d 260, 268 (Wyo. 2018) ("Likewise, jurisdictional issues regarding the justiciability of a declaratory judgment action are questions of law subject to *de novo* review." (quoting *Int'l Ass'n of Firefighters Loc. Union No. 279 v. City of Cheyenne*, 2013 WY 157, ¶ 8, 316 P.3d 1162, 1166 (Wyo. 2013))).

[¶29] We review motions for judgment on the pleadings pursuant to W.R.C.P. 12(c) de novo. *Elworthy v. First Tennessee Bank*, 2017 WY 33, ¶ 20, 391 P.3d 1113, 1119 (Wyo. 2017) (citing *Swinney v. Jones*, 2008 WY 150, ¶ 6, 199 P.3d 512, 515 (Wyo. 2008)). Under Rule 12(c), we have stated:

> A defendant is entitled to judgment on the pleadings if the undisputed facts appearing in the pleadings, supplemented by any facts of which the district court may take judicial notice, establish that no relief can be granted. . . . A judgment on the pleadings is appropriate if all material allegations of fact are admitted in the pleadings and only questions of law remain.

7

*Elworthy*, ¶ 21, 391 P.3d at 1119 (quoting *Inman v. Boykin*, 2014 WY 94, ¶ 13, 330 P.3d 275, 279 (Wyo. 2014)).

[¶30]  A district court's order granting summary judgment is reviewed de novo. *Matter of Phyllis v. McDill Revocable Tr.*, 2022 WY 40, ¶ 16, 506 P.3d 753, 759 (Wyo. 2022) (*McDill II*) (citing *Bear Peak Res., LLC v. Peak Powder River Res., LLC*, 2017 WY 124, ¶ 10, 403 P.3d 1033, 1040 (Wyo. 2017)).  In reviewing a grant of summary judgment:

> This Court reviews the same materials and uses the same legal standard as the district court.  [*Thornock v. PacifiCorp*, 2016 WY 93, ¶ 10, 379 P.3d 175, 179 (Wyo. 2016).]  The record is assessed from the vantage point most favorable to the party opposing the motion, and we give a party opposing summary judgment the benefit of all favorable inferences that may fairly be drawn from the record.  *Id.*  A material fact is one that would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.  *Id.*

*Holding v. Luckinbill*, 2022 WY 10, ¶ 12, 503 P.3d 12, 16 (Wyo. 2022) (quoting *Bd. of Trustees of Laramie Cnty. v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 2020 WY 41, ¶ 6, 460 P.3d 251, 254 (Wyo. 2020)).  Both parties have agreed there is no dispute of material fact.

[¶31]  This matter will require the interpretation of the BRT trust agreement.  "The interpretation of unambiguous trust agreements is a matter of law for the court."  *Forbes*, ¶ 23, 341 P.3d at 1051 (citing *Evans v. Moyer*, 2012 WY 111, ¶ 21, 282 P.3d 1203, 1210 (Wyo. 2012)); *McDill II*, ¶ 16, 506 P.3d at 760 (citing *Jackson as Tr. of Phillip G. Jackson Fam. Revocable Tr. v. Montoya*, 2020 WY 116, ¶ 16, 471 P.3d 984, 988 (Wyo. 2020)).  Further, determining the standard for measuring the performance of trustees is a question of law we review de novo.  *Forbes*, ¶ 23, 341 P.3d at 1051 (citation omitted).

## DISCUSSION

## I.     *The district court did not err when it held Spike lacked standing under the Uniform Declaratory Judgments Act.*

[¶32]  Spike argues the district court erred when it applied prudential standing principles to find he lacked standing under the Uniform Declaratory Judgments Act.  Wyo. Stat. Ann. §§ 1-37-101 through -115.  The Act permits courts to "declare rights, status and other legal relations whether or not further relief is or could be claimed."  Wyo. Stat. Ann. § 1-37-102.  Section 1-37-105 provides, in relevant part:

(a)     Any person interested as or through an executor, administrator, trustee, guardian or other fiduciary, . . . or beneficiary of a trust, in the administration of a trust . . . may have a declaration of rights or other legal relations in respect thereto:

.    .    .

(ii)     To direct the executors, administrators or trustees to do or abstain from doing any particular act in their fiduciary capacity; or

(iii)     To determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings.

Wyo. Stat. Ann. § 1-37-105 (LexisNexis 2021).  Spike asserts he has statutory standing to seek declaratory relief under this provision because he is a beneficiary of the BRT.  Further, Spike argues he has statutory standing because he is asking the Court to interpret the trust agreement to require that the "fair value" of reacquired shares be based on a pro rata interest of an accurate valuation of the whole BRT.  Spike's argument fails because his claims must satisfy the principles of prudential standing to maintain an action for declaratory judgment.

[¶33]  In order to maintain an action for declaratory judgment, the party seeking relief must be an "interested" person. *The Tavern, LLC v. Town of Alpine*, 2017 WY 56, ¶ 25, 395 P.3d 167, 174 (Wyo. 2017) (citing *Carnahan v. Lewis*, 2012 WY 45, ¶ 17, 273 P.3d 1065, 1071 (Wyo. 2012)).  "The 'requirement of an 'interest' captures the basic doctrine that there must be a justiciable controversy before relief will be granted.'" *William F. West Ranch, LLC v. Tyrrell*, 2009 WY 62, ¶ 11, 206 P.3d 722, 727 (Wyo. 2009) (quoting *Barber v. City of Douglas*, 931 P.2d 948, 951 (Wyo. 1997)).  To determine whether a justiciable controversy exists under the Uniform Declaratory Judgments Act, the Court has long applied the prudential standing test articulated in *Brimmer*. *See, e.g.*, *Johnson Cnty. Ranch Improvement #1, LLC v. Goddard*, 2020 WY 115, ¶ 51, 471 P.3d 307, 322 (Wyo. 2020); *Allred*, ¶ 37, 409 P.3d at 270 (quoting *Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo. 1974)); *William F. West Ranch*, ¶ 12, 206 P.3d at 727; *see also McDill II*, ¶ 29, 506 P.3d at 762 ("Prudential standing requires application of the *Brimmer* test, a four-part test to determine 'whether there is 'such dispute which could serve as the basis of a justiciable issue[.]'" (quoting *Allred*, ¶ 37, 409 P.3d at 270)).

[¶34]  *Brimmer* articulated the following four-part test for standing:

1. The parties have existing and genuine, as distinguished from theoretical, rights or interests.

9

2. The controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion.

3. It must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities to be of such great and overriding public moment as to constitute the legal equivalent of all of them.

4. The proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues.

*Johnson Cnty. Ranch Improvement*, ¶ 51, 471 P.3d at 322 (quoting *Leavitt v. State ex rel. Wyoming Dep't of Transp.*, 2017 WY 149, ¶ 7, 406 P.3d 1266, 1269 (Wyo. 2017)); *Allred*, ¶ 37, 409 P.3d at 270 (quoting *Brimmer*, 521 P.2d at 578).

[¶35]  Spike does not make a prudential standing argument on appeal but still seeks for this Court to remand the matter back to the district court to address all his claims for declaratory judgment. Spike's claims are related to the Trustees' transaction with the Scotts, his ability to transfer shares in the future, and an alleged devaluation of his shares. Under the first factor of *Brimmer*, Spike must have an existing "tangible interest which has been harmed." *Johnson Cnty. Ranch Improvement*, ¶ 52, 471 P.3d at 322 (quoting *Allred*, ¶ 44, 409 P.3d at 273). A party with a tangible interest is considered to have a "personal stake in the outcome of the controversy." *Devon Energy Prod. Co., LP v. Grayson Mill Operating, LLC*, 2020 WY 28, ¶ 17, 458 P.3d 1201, 1206–07 (Wyo. 2020) (quoting *Jolley v. State Loan & Inv. Bd.*, 2002 WY 7, ¶ 6, 38 P.3d 1073, 1076 (Wyo. 2002)). When Spike gifted his shares to the Scotts, Spike no longer held a tangible interest in the transactions between the Scotts and the Trustees as it related to the shares. Further, since the shares belonged to the Scotts, Spike had no tangible interest in any potential damages the Scotts may have claimed. Therefore, Spike has no standing for declaratory relief over the Trustees' transactions with the Scotts.

[¶36]  Spike is also seeking declaratory relief out of concerns for his future ability to transfer his shares in the BRT. Spike seeks a declaration that the Trustees must determine the "fair value" of shares to future donees under Article Twelfth by considering the pro rata interest of the whole BRT's value as established through a third-party appraisal or

10

other valuation method. "[T]he Declaratory Judgments Act gives the courts no power to determine future rights or anticipated disputes or controversies." *William F. West Ranch*, ¶ 13, 206 P.3d at 727 (quoting *White v. Bd. of Land Comm'rs*, 595 P.2d 76, 79 (Wyo. 1979)). Further, "[t]he declaratory judgment procedure cannot be used to secure an advisory judgment." *Johnson Cnty. Ranch Improvement*, ¶ 50, 471 P.3d at 322 (citing *Rocky Mountain Oil & Gas Ass'n v. State*, 645 P.2d 1163, 1168 (Wyo. 1982)). We agree with the district court when it stated:

> Spike is asking the Court to issue an advisory opinion about something that may happen in the future, but is not certain to occur. His claim is contingent upon at least two things happening: 1) Spike transferring his shares to a person who is not a descendant or widow(er) of a descendant of William Hathaway Forbes; and 2) the Trustees exercising their option under Article Twelfth. Additionally, this claim seeks to adjudicate the rights of unknown third parties—whoever the future donees may be.

[¶37] Spike lastly seeks declaratory relief for an alleged devaluation of his remaining shares. Spike did not present evidence below and does not argue on appeal how the transaction with the Scotts devalued his shares. Under the terms of the BRT, Spike is still entitled to the pro rata value of the underlying assets when the BRT terminates in 2036. A party asserting standing "must show a 'perceptible,' rather than a 'speculative' harm from the action[. A] remote possibility of injury is not sufficient to confer standing." *Skaf*, ¶ 11, 495 P.3d at 892 (quoting *Halliburton Energy Servs., Inc. v. Gunter*, 2007 WY 151, ¶ 11, 167 P.3d 645, 649 (Wyo. 2007)). Spike's assertion in his complaint that the Trustees somehow devalued his shares is merely speculative.

[¶38] Spike failed to present a justiciable controversy in his claims for declaratory relief. We therefore affirm the district court's holding that Spike lacked standing under the Uniform Declaratory Judgments Act.

[¶39] Despite its finding that Spike lacked standing to seek declaratory relief, the district court still analyzed Spike's breach of fiduciary duty claims against the Trustees.[3] In his complaint, Spike alleged the Trustees had breached their fiduciary duty of loyalty, in part, through self-dealing. Spike alleges Trustee Edith's purchase of a share through the sealed bidding process resulted in a benefit to herself at the expense of the beneficiaries. As a beneficiary of the BRT, Spike has a tangible interest in the manner in which a BRT share

---

[3] This Court acknowledged in *Forbes* that the Wyoming Uniform Trust Code (UTC) enacted in 2003 does not apply to the BRT. *See Forbes*, ¶ 27, 341 P.3d at 1052 n.5. Thus, Spike raises his breach of fiduciary duty claims under the common law and must have prudential standing to raise the claims. *See McDill II*, ¶¶ 29–31, 506 P.3d at 762–63 (discussing that a party must have statutory standing under the UTC to bring a claim for breach of the fiduciary duty of loyalty).

was distributed to Trustee Edith. Therefore, Spike had standing to raise claims against the Trustees for breach of fiduciary duties.

***II.   The district court erred in finding Trustee Edith had not breached her duty of loyalty through self-dealing when she received a BRT share through the sealed bidding process.***

[¶40] Spike contends on appeal that the district court erred when it found the Trustees had not breached their fiduciary duties of loyalty by using the sealed bidding process as a method to appraise the gifted shares for their "fair value." Spike also contends the district court erred when it held the Trustees had not engaged in impermissible self-dealing when they sold the reacquired shares to the beneficiaries, which included Trustee Edith.

[¶41] Resolution of this matter requires interpreting the terms of the BRT. The meaning of a trust is determined by the same rules governing the interpretation of contracts. *Jackson*, ¶ 16, 471 P.3d at 988 (citing *Shriners Hosps. for Children v. First N. Bank of Wyoming*, 2016 WY 51, ¶ 40, 373 P.3d 392, 405–06 (Wyo. 2016)). Our primary purpose is to determine the intent of the settlor. *Jackson*, ¶ 16, 471 P.3d at 988 (citing *Forbes*, ¶ 72, 341 P.3d at 1061; *Gowdy v. Cook*, 2020 WY 3, ¶ 39, 455 P.3d 1201, 1210–11 (Wyo. 2020)); *see also Shriners Hosps. for Children*, ¶ 60, 373 P.3d at 410 ("Wyoming's jurisprudence has long reflected [the] 'commitment to the protection of the settlor's intent'" (citations omitted)). To determine the settlor's intent, the Court looks to the "plain language contained in the four corners of the document." *Jackson*, ¶ 16, 471 P.3d at 988 (quoting *EGW v. First Fed. Sav. Bank of Sheridan*, 2018 WY 25, ¶ 30, 413 P.3d 106, 115 (Wyo. 2018)).

[¶42] When interpreting the BRT, the Court "construe[s] the trust instrument as a whole, attempting to avoid a construction which renders a provision meaningless. We strive to reconcile by reasonable interpretation any provisions which apparently conflict before adopting a construction which would nullify any provision." *Gowdy*, ¶ 39, 455 P.3d at 1210–11 (quoting *Shriners Hosps. for Children*, ¶ 40, 373 P.3d at 405–06); *see also Forbes*, ¶ 72, 341 P.3d at 1061. Further, the Court "construe[s] the language in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the trust to ascertain the intent of the parties at the time the agreement was made." *Wells Fargo Bank Wyoming, N.A. v. Hodder*, 2006 WY 128, ¶ 16, 144 P.3d 401, 408 (Wyo. 2006) (citing *Carlson v. Flocchini Invs.*, 2005 WY 19, ¶ 15, 106 P.3d 847, 854 (Wyo. 2005); *Hickman v. Groves*, 2003 WY 76, ¶ 7, 71 P.3d 256, 258 (Wyo. 2003)).

[¶43] To determine a trustee's standard of care, the Court considers "the trust provisions and the statutes governing trusts in Wyoming." *Acorn v. Moncecchi*, 2016 WY 124, ¶ 54, 386 P.3d 739, 756 (Wyo. 2016) (citing *Forbes*, ¶¶ 23–27, 341 P.3d at 1051–52). Generally, the "common duty owed by a trustee goes beyond mere 'good faith' unless otherwise provided by express terms of the trust." *Id.* (quoting *Hoddor*, ¶ 33, 144 P.3d at 413 n.7).

[¶44]  The Trustees of the BRT, "like a director and officer of a corporation, owe[] the trust and its investors fiduciary duties of care and loyalty[.]" *Forbes*, ¶ 23, 341 P.3d at 1051 (quoting *Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113, 135 (D. Mass. 2009)).  The BRT trust agreement provides that "No trustee hereunder shall be held personally liable for any act or omission whatever which he performs, commits, or suffers in good faith." *See also Forbes*, ¶ 23, 341 P.3d at 1051.  This Court has "defined 'good faith' as 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness.'"  *Id.* ¶ 26, 341 P.3d at 1051 (quoting *Hodder*, ¶ 33, 144 P.3d at 413).  Further, "a good faith standard does not exclude application of fiduciary obligations imposed by Wyoming statutory provisions." *Id.* ¶ 27, 341 P.3d at 1051–52 (citing *Kerper v. Kerper*, 780 P.2d 923, 930 (Wyo. 1989)).

[¶45]  We previously held the application of the fiduciary standards contained in the previous Uniform Trustees' Powers Act, Wyo. Stat. Ann. §§ 4-8-101 through -112 (repealed 2003), and the Uniform Prudent Investor Act, Wyo. Stat. Ann. §§ 4-9-101 through -113 (repealed 2003), are consistent with a good-faith standard.  *Forbes*, ¶ 27, 341 P.3d at 1051–52.  Therefore, "the BRT trustees must conduct themselves in compliance with the statutory duty of loyalty, which requires that '[a] trustee shall invest and manage the trust assets solely in the interest of the beneficiaries.'"  *Id.* (quoting Wyo. Stat. Ann. § 4-9-105 (repealed 2003, replaced by Wyo. Stat. Ann. § 4-10-905, which has identical language)).  However, "while we recognize that a beneficiary is entitled to the trustee's proper exercise of its fiduciary duty, our consideration of a breach of fiduciary claim is 'governed by the settlor's intent, not the beneficiaries' preferences.'"  *Shriners Hosps. for Children*, ¶ 61, 373 P.3d at 410 (quoting *Rock Springs Land & Timber, Inc. v. Lore*, 2003 WY 100, ¶ 25, 75 P.3d 614, 624 (Wyo. 2003)).

[¶46]  Spike claims the Trustees had breached their fiduciary duties of loyalty by using the sealed bidding process to appraise the value of his gifted shares.[4]  Whether the Trustees breached their fiduciary duty of loyalty by using the sealed bidding process is dependent on the terms of the trust agreement.  The BRT provides a broad general grant of power to the Trustees.  *See Forbes*, ¶ 74, 341 P.3d at 1061.  Article Third states:

> Any two trustees shall have power to do any such things and
> execute any such instruments and take any such action as they
> deem wise in relation to the granted premises and the trust

---

[4] Spike suggests this Court should look to corporate law regarding forced buyouts of shares to determine the meaning of "fair value" and "appraisal."  However, Spike fails to cite any authority where corporate law has governed trust administration.  As the district court stated, "the restrictions placed on the BRT make it fundamentally different from a corporation, and the method used to value a corporation in a forced buyout does not apply to transactions under Article Twelfth."

13

estate for the time being to the same effect and to the same extent as if they held the same free of any trust whatsoever.

Reacquisition of shares gifted to a non-descendant of William Hathaway Forbes is governed by Article Twelfth, as quoted *supra* ¶ 7. Article Twelfth provides, in part, the Trustees "shall have an option to purchase the same at its fair value and shall have power to appraise said interest and determine the value thereof, such appraisal to be binding and conclusive." This article expressly grants the Trustees the power to appraise the value of the shares to be reacquired.

[¶47] Black's Law Dictionary defines the word "appraisal" as:

1. The determination of what constitutes a fair price for something or how its condition can be fairly stated; the act of assessing the worth, value, or condition of something. 2. The report of such a determination; specif., a statement or opinion judging the worth, value, or condition of something.

*Appraisal*, Black's Law Dictionary (11th ed. 2019).[5] Thus, the plain meaning of the word "appraise" as used in Article Twelfth intends for the Trustees to determine the value of the shares to be reacquired. This meaning does not necessarily require the Trustees to appraise the value of the whole BRT through a certified third-party appraiser or other valuation method, as Spike contends. Further, the Trustees' power to appraise the fair value of the shares under Article Twelfth can be read in conjunction with the Trustees' general grant of power under Article Third. *See also Forbes*, ¶ 74, 341 P.3d at 1061. The language of the trust agreement demonstrates the settlor's intent to provide the Trustees with discretion on how to determine the fair value of shares reacquired under Article Twelfth.

[¶48] Spike relies on *Forbes* to argue the Trustees breached their fiduciary duties because they failed to obtain an accurate appraisal of the whole BRT before reacquiring the shares. In *Forbes*, Trustees Julia and Cam engaged in complicated land exchanges for BRT shares pursuant to Article Eighth.[6] *Forbes*, ¶ 64, 341 P.3d at 1059. Though Article Eighth allows

---

[5] The district court defined "appraise" as: "to estimate the money value of; set a price or value on, especially by authority of law or agreement of interested parties." (quoting 1 New Standard Dictionary of the English Language 139 (1941)). The district court's definition is substantially similar to the modern definition used in Black's Law Dictionary (11th ed. 2019).

[6] Article Eighth provides:

The trustees for the time being hereunder shall have full power to sell, lease, mortgage, pledge, lend, or exchange free and clear of the trust any and all portion or portions of the trust estate at such time, for such considerations, and upon such terms and conditions as they deem advisable. This power shall extend to everything which shall hereafter be

14

trustees to exchange portions of the trust estate, the Court found Trustee Julia breached her duty of loyalty when she "engaged in land and money exchanges with the BRT, which were compounded by the absence of objective advice or third-party review[.]" *Id.* ¶ 69, 341 P.3d at 1060. In reaching its holding, the Court stated the Trustees "failed to obtain an accurate appraisal of the specific lands at issue, they did not retain separate counsel to advise the BRT, they made no effort to obtain court approval for the transactions, and they did not obtain prior approval of these specific transactions from the beneficiaries." *Id.* ¶ 68, 341 P.3d at 1060. In the present matter, the transactions were made pursuant to Article Twelfth for the reacquisition of shares, rather than land exchanges under Article Eighth. Article Twelfth gives the Trustees the power to appraise the fair value of BRT shares and broad authority to determine the method of valuation. The Trustees' appraised value of the BRT shares under Article Twelfth is not used as an exchange rate for lands to be acquired or sold by the Trustees. Rather, the appraised value per share is used as the reacquisition price of shares being held by non-descendants of William Hathaway Forbes. The nature of the transactions in *Forbes* and in the present matter are inherently different. Therefore, Spike's reliance on *Forbes* to argue the Trustees used an improper valuation method under Article Twelfth is misplaced.

[¶49] The Trustees chose to use the sealed bidding process to appraise the "fair value" of the gifted shares. In its request for bids, the Trustees informed the beneficiaries "that the fair value of the BRT shares can best be thought of as the price that a knowledgeable, financially unrelated party would pay for the shares[.]" The Trustees felt the confidential nature of the sealed bidding process would force each bidder to bid the highest price they would be willing to pay for a share. The Trustees also felt the process would inform them on how much they could fairly spend on recovering the shares without the BRT losing money. Additionally, in their response letters to the dissatisfied Scotts, the Trustees stated their belief that "[t]he fairest and most accurate way to appraise the value of any asset is to use the actual price that knowledgeable and eligible buyers will pay for it." Article Twelfth of the BRT expressly provides the Trustees with the power to appraise the value of shares acquired by non-descendants and purchase them at "fair value." The Trustees acted pursuant to the terms of Article Twelfth and exercised their fiduciary duties in accordance with the settlor's intent. *See Shriners Hosps. for Children*, ¶ 61, 373 P.3d at 410 (quoting *Rock Springs Land & Timber*, ¶ 25, 75 P.3d at 624). Therefore, the district court properly found the Trustees' use of the sealed bidding process to appraise the fair value of BRT shares did not breach their fiduciary duty of loyalty.

[¶50] Spike also contends the Trustees had engaged in impermissible self-dealing when they sold the reacquired shares at less than fair value to the beneficiaries, which included Trustee Edith. In *Forbes*, we stated:

---

added to the trust estate or received in exchange for the premises hereby conveyed.
*See also Forbes*, ¶¶ 73–74, 341 P.3d at 1061.

The duty of loyalty prohibits self-dealing by trustees, because "[i]t is not possible for any person to act fairly in the same transaction on behalf of himself and in the interest of the trust beneficiary." Bogert, [*The Law of Trusts and Trustees*], § 543, at 227. Any transaction involving trust property and an entity in which the trustee has an interest raises conflict of interest concerns. "Self-dealing by a trustee or any fiduciary is always suspect, and it is a universal rule of equity that a trustee shall not deal with trust property to his own advantage without the knowledge or consent of the *cestui que trust*." *Hosey v. Burgess*, 319 Ark. 183, 890 S.W.2d 262, 265 (1995). The trustee's duty of loyalty "prohibits both self-dealing and conflicts of interest. Thus, the trustee must neither 1) deal with trust property for the benefit of himself or third parties, nor 2) place himself in a position inconsistent with the interests of the trust." *In re Paxson Trust*, 893 A.2d 99, 121 (Pa. Super. Ct. 2006) (quoting *Estate of McCredy*, 323 Pa. Super. 268, 470 A.2d 585, 597 (1983) (internal citations omitted)). This court held in 1927 that:

> A trustee is bound to act with good faith. He is not to use the trust property in his own private business, nor is he to make any incidental profits for himself in its management, nor is he to acquire pecuniary gains from his fiduciary position. An important duty of good faith prohibits the trustee from mixing the trust property and his own property together in one amount, the depositing of trust moneys in his own personal account with his own moneys in bank, and all similar modes of combining or failing to distinguish between the two funds. This rule is designed to protect the trustee from temptation, from the hazard of loss, and of being a possible defaulter, as well as to protect the trust fund.

> *In re Reed's Estate*, 37 Wyo. 107, 259 P. 815, 817 (1927) (quoting *In re Hodges' Estate*, 66 Vt. 70, 28 A. 663, 663–64 (1894)).

*Forbes*, ¶ 59, 341 P.3d at 1058–59. We also noted in *Forbes* that "[a] trustee with power to sell trust property is under a duty not to sell to himself either by private sale or at auction, whether the property has a market price or not, and whether or not the trustee makes a

16

profit thereby." *Id.* ¶ 59, 341 P.3d at 1058 n.9 (quoting Restatement (Second) of Trusts § 170 cmt. b (Am. L. Inst. 1959)).

[¶51] The district court held the Trustees had not engaged in self-dealing because they took steps to disadvantage themselves in the bidding process. Specifically, the district court pointed to the rules established in the revised request for bids, which stated "[i]n the event that the per-share price offered by a trustee bidder and a non-trustee bidder are equal then the bid submitted by the non-trustee bidder will be given first priority." The district court also noted the bidding process included all the past and current adult beneficiaries as potential bidders and the bids were confidential. These circumstances, the district court reasoned, did not provide any of the Trustees with an advantage and there was no guarantee any of the Trustees would submit a winning bid. The district court also relied on the terms of Article Twelfth, which stated that the reacquired shares may be sold or conveyed to "any person or persons descended from William Hathaway Forbes as aforesaid or the widower or widow of any such descendant." The district court asserted the current Trustees were allowed to purchase shares for themselves under this provision.

[¶52] As a result of the sealed bidding process, Trustee Edith received one additional share in the BRT. We find her acquisition of the share constitutes impermissible self-dealing. In explaining a trustee's duty of loyalty, we previously stated:

> Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties. To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with "uncompromising rigidity."

*Forbes*, ¶ 58, 341 P.3d at 1058 (quoting *Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 616, 113 S.Ct. 2264, 2276, 124 L.Ed.2d 539 (1993)).

[¶53] The district court relied on Article Twelfth and the broad authority granted to the Trustees to find they were allowed to submit bids and purchase shares through their sealed bidding process without breaching their fiduciary duty of loyalty. The settlor of a trust "has a right to modify the fiduciary duties that ordinarily govern the administration of a trust." *Kerper*, 780 P.2d at 929–30. When a settlor intends to modify such fiduciary duties, the settlor's clearly expressed intent should be zealously guarded. *Shriners Hosps. for Children*, ¶ 57, 373 P.3d at 409. However, as explained in the Restatement (Third) of Trusts § 78, cmt. c(2):

> Even an express authorization of this type . . . would not completely dispense with the trustee's underlying fiduciary

17

obligations to act in the interest of the beneficiaries and to exercise prudence in administering the trust. Accordingly, no matter how broad the provisions of a trust may be in conferring power to engage in self-dealing or other transactions involving a conflict of fiduciary and personal interests, a trustee violates the duty of loyalty to the beneficiaries by acting in bad faith or unfairly.

Restatement (Third) of Trusts § 78 cmt. c(2) (Am. L. Inst. 2007). Thus, trustees may engage in self-dealing when permitted through the terms of the trust, but proper precautions must be taken to ensure the trustee is not acting in bad faith or unfairly to the beneficiaries. The purpose of this limit to the settlor's freedom is to protect "the fundamental fiduciary character of trust relationships recognized by the law." *Id.* To determine whether a trustee breached their duty of loyalty for impermissible self-dealing is still ultimately dependent on the terms of the trust. *See Shriners Hosps. for Children*, ¶ 61, 373 P.3d at 410; *see also* Restatement (Third) of Trusts § 78 cmt c(2).

[¶54] In the present matter, Article Twelfth states, in part, that: "After purchase [the Trustees] shall hold in trust said interest to sell and convey the same in their discretion to *any* person or persons descended from William Hathaway Forbes as aforesaid or the widower or widow of any such descendent." (Emphasis added.) Additionally, Article Fourteenth allows for trustees to be beneficiaries.[7] However, even though trustees/beneficiaries are granted broad authority and discretion, the terms of the BRT limit the Trustees to act in good faith. *See also Forbes*, ¶ 23, 341 P.3d at 1051. Thus, the terms of the BRT limit the Trustees discretion to purchase shares for themselves under Article Twelfth.

[¶55] The district court reasoned there was no impermissible self-dealing because the Trustees had disadvantaged themselves in the bidding process. However, the Trustees controlled the whole process. The Trustees are responsible for choosing to exercise the option under Article Twelfth. The Trustees established the bidding process and the rules to govern that process. The Trustees also chose to set the minimum bid price at $4,000. In his letter to the Sheridan College Foundation, Trustee Cam acknowledged that this minimum price represented a discounted value of the BRT shares. Three of the four Trustees submitted bids. The amounts Trustees Donald and Edith bid ultimately set $5,972.22 to be the "fair value" for each share. The rules articulated in the revised request for bids did not prevent any of these advantages and were not sufficient precautions to allow the Trustees to acquire shares through the sealed bidding process. Out of this process

---

[7] Article Fourteenth states, in part: "In making sale for purposes of distribution [of assets at the BRT's termination] the trustees may sell to themselves irrespective of the fact that they are or might be deemed interested parties."

established and controlled by the Trustees, Trustee Edith unfairly acquired one share of the BRT and thus breached her fiduciary duty of loyalty.

[¶56] We conclude the district court erred by not finding Trustee Edith had engaged in impermissible self-dealing when she purchased a BRT share through the sealed bidding process. After finding a breach of the duty of loyalty:

> If the trustee purchas[ed] for himself individually an interest in the subject matter of the trust of such a character that the effect of permitting him to purchase the interest for himself might be to subject him to a temptation not to act solely in the interest of the beneficiary in the administration of the trust . . . the beneficiary can charge him as constructive trustee of the interest so purchased . . . .

Restatement (Second) of Trusts § 206 cmt. h (Am. L. Inst. 1959); *see also* Susan N. Gary et al., *The Law of Trusts and Trustees* § 543(V), at 608 (3d ed. 2019) ("Where there has been self-dealing by the trustee, the beneficiary may seek several different remedies."). "[A] constructive trust is a trust imposed by a court of equity to compel a person who unfairly holds a property interest to convey such interest to the rightful owner." *Courtenay C. & Lucy Patten Davis Found. v. Colorado State Univ. Rsch. Found.*, 2014 WY 32, ¶ 16, 320 P.3d 1115, 1119 (Wyo. 2014) (quoting 76 Am. Jur. 2d *Trusts* § 132 (2005)). Therefore, as a remedy for her breach of fiduciary duty, a constructive trust will be imposed, and Trustee Edith will be required to convey the single BRT share back to the Trust to hold or convey in an appropriate manner.[8]

### III. The district court did not err in finding the BRT's 2019 Annual Report satisfied all the requirements for a common law accounting.

[¶57] Spike asserts the district court erred in finding the Trustees' 2019 Annual Report satisfied the requirements of a common law accounting. Spike contends the Trustees' accounting does not contain clear, complete, and accurate information on all the real property assets of the BRT, and the report improperly valued the BRT's real property.

[¶58] The district court held the Trustees' duty to account under the BRT is governed by common law. Neither party challenges this holding on appeal. Therefore, we will apply the common law requirements for an accounting to the Trustees' 2019 Annual Report. Under the common law, "[t]he trustee is under a duty to the beneficiary to keep and render clear and accurate accounts with respect to the administration of the trust." Restatement (Second) of Trusts § 172; *see also Snell v. Snell*, 2016 WY 49, ¶ 32, 374 P.3d 1236, 1244 (Wyo. 2016) (quoting *Jacob v. Davis*, 738 A.2d 904, 911–12 (Md. Ct. Spec. App. 1999)).

---

[8] Spike is not seeking the removal of any of the Trustees in this matter.

In *Snell*, while discussing the common law requirements for an accounting, this Court stated:

> The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust.

*Snell*, ¶ 30, 374 P.3d at 1243 (quoting Restatement (Second) of Trusts § 173). Further, this Court stated:

> [A]lthough the terms of the trust may regulate the amount of information which the trustee must give and the frequency with which it must be given, the beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust.

*Id.* ¶ 30, 374 P.3d at 1243 (emphasis omitted) (quoting Restatement (Second) of Trusts § 173 cmt. c).

[¶59]   The terms of the BRT do not state what information is required in an accounting. Generally, a trustee's accounting should, at a minimum, "inform beneficiaries about the trust's assets, liabilities, receipts, disbursements, and the trustee's compensation." Alan Newman et al., *The Law of Trusts and Trustees* § 963, at 85–86 (3d ed. 2010). The accounting should also contain "such basic information about the trust as the fact of its existence, who created it, who the trustee is, that the beneficiary is entitled to receive information from the trustee about the trust, and how the beneficiary can contact the trustee." Newman, *supra*, § 962, at 45–46. In *Snell*, this Court stated:

> [T]he beneficiary is entitled to demand of the trustee all information about the trust and its execution for which he has any reasonable use. . . .
>
> If the beneficiary asks for relevant information about the terms of the trust, its present status, past acts of management, the intent of the trustee as to future administration, or other incidents of the administration of the trust, and these requests are made at a reasonable time and place and not merely vexatiously, it is the duty of the trustee to give the beneficiary the information for which he has asked.

*Snell*, ¶ 32, 374 P.3d at 1244 (quoting *Jacob*, 738 A.2d at 911–12 (quoting George Bogert, *The Law of Trusts and Trustees* § 961 (Rev. 2d ed. 1983))). Relying on a comprehensive analysis from the Maryland court of appeals, this Court also stated:

> A trustee is under a duty to the beneficiaries of the trust to keep clear and accurate accounts. His accounts should show what he has received and what he has expended. They should show what gains have accrued and what losses have been incurred on changes of investments. If the trust is created for beneficiaries in succession, the accounts should show what receipts and what expenditures are allocated to principal and what are allocated to income.

> .   .   .

> Not only must the trustee keep accounts, but he must render an accounting when called on to do so at reasonable times by the beneficiaries. Where there are several beneficiaries, any one of them can compel an accounting by the trustee. The fact that a beneficiary has only a future interest . . . does not preclude him from compelling the trustee to account.

*Snell*, ¶ 32, 374 P.3d at 1244 (quoting *Jacob*, 738 A.2d at 911–12 (quoting Austin W. Scott and William F. Fratcher, *The Law of Trusts* § 172 (Vol. IIA 4th ed. 1987))).

[¶60] Spike primarily argues on appeal that the Trustees' 2019 Annual Report is an incomplete and inaccurate valuation of the BRT's real property assets. Spike points to a 2016 valuation of the BRT, which valued the BRT's real property assets at approximately $22,000,000, to argue the Trustees' 2019 report is inaccurate because it valued the totality of the BRT's assets at $4,944,732. Within the 2019 report, the Trustees state the value of the real property was based on a county tax assessment. Spike asserts the tax assessment is an inaccurate method to value the real property assets. Rather, Spike contends, the accounting should report the real properties' fair market value or other similar valuation as had been used in the previous annual reports. A trustee's accounting is required to provide a beneficiary "complete and accurate information as to the nature and amount of the trust property." *Snell*, ¶ 30, 374 P.3d at 1243 (quoting Restatement (Second) of Trusts § 173). As the district court explained below, "[w]hile *Snell* and the relevant Restatement sections require a common law accounting to set forth the nature and 'amount' of the trust property, they do not specifically require the accounting to set forth the fair market value of each asset." Therefore, the Trustees were not required to report the fair market value of all the BRT's real property assets.

21

[¶61]  Spike also suggests he is entitled to an annual accounting containing a fair market value of the BRT's real property assets.  Under Wyoming's statutes codifying the Uniform Trust Code, "[a] trustee shall send to qualified beneficiaries, at least annually and at the termination of the trust, a report of the trust property . . . ."  Wyo. Stat. Ann. § 4-10-813(c) (LexisNexis 2021).  However, the common law rule states that a beneficiary is entitled to information only when they request it "at reasonable times."  *Snell*, ¶ 32, 374 P.3d at 1244 ("Not only must the trustee keep accounts, but he must render an accounting when called on to do so at reasonable times by the beneficiaries."  *Jacob*, 738 A.2d at 911–12 (quoting Scott and Fratcher, *supra*, § 172)); Restatement (Second) of Trusts § 173 ("The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information . . . ."); *see also* Newman, *supra*, § 962, at 23 ("[T]he duty [to provide information] extends only to information requests that are reasonable.").  Though Spike is a beneficiary entitled to information at reasonable times, he is not necessarily entitled to annual reports containing the fair market value of the BRT's real property assets.  To the degree Spike is seeking regular appraisals of the BRT's real property, it would be unreasonable to require the Trustees to undergo expensive appraisals of the real property each year.  However, the Trustees are required to permit Spike or persons authorized by Spike "to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust."  Restatement (Second) of Trusts § 173.  Thus, if Spike needs an appraisal of the real property to enforce his rights in the trust or for some other reasonable use, Spike can seek an appraisal at his own expense.

[¶62]  For the 2019 Annual Report to be sufficient, it must contain "complete and accurate information as to the nature and amount of the trust property."  Restatement (Second) of Trusts § 173.  The report contains a list of the current beneficiaries and number of outstanding shares.  The report also lists the Trustees and their phone numbers and states "[i]f any beneficiary has questions or comments, or would like to see copies of supporting documents such as investment account statements, property appraisals, property tax assessment notices, lease agreements, or tax returns, please contact the trustees."  The report contains a "BRT Financial Summary" which lists the value of investment accounts, rental receipts, dividends received, interest received, other receipts, property taxes, fees for professional services including litigation and accounting, purchases of property, recognized capital gains and losses, and unrealized investment gains and losses.  Further, the report lists all the real property assets held by the BRT as of December 31, 2019.  It also lists the real properties' legal descriptions and the value given to each asset "based on Sheridan County Assessor's assessments of fair value in 2019."  An appendix of the report provides a map of the real property holdings of the BRT.  Lastly, the report contains blank share transfer forms.

[¶63]  Spike argues the district court failed to make any findings that the 2019 Annual Report was either clear, complete, or accurate.  However, the district court specifically stated:

35. The [2019 Annual Report] lists all of the real property owned by the trust, and it gives the parcel number for each property and includes a map to show where the property is located. The [report] also sets forth the assessor's value for each parcel. [Spike] was also given a copy of the appraisal of the real property that was conducted in 2015. Therefore, it appears that the Trustees have given [Spike] "complete and accurate information" about the nature and amount of the real property, and this portion of the [report] satisfies the requirements for a common law accounting under *Snell*.

Further, the district courted concluded "that the [report] submitted by the Trustees in June 2020 satisfies all of the requirements for a common law accounting under *Snell*, and there is nothing further for the Court to order the Trustees to produce." We agree with the district court. Therefore, the district court's finding that the Trustees' 2019 Annual Report was sufficient to satisfy the common law requirements of an accounting is affirmed.

## *CONCLUSION*

[¶64]  We affirm the district court's finding that Spike lacked standing to seek declaratory judgment regarding the valuation of his gifted shares.

[¶65]  We affirm the district court's conclusion that the Trustees did not breach their duty of loyalty by using the sealed bidding process as a method to appraise the "fair value" of the reacquired shares pursuant to Article Twelfth. We also affirm the district court's order finding that the Trustees' 2019 Annual Report contained clear, complete, and accurate information as required under common law.

[¶66]  Trustee Edith breached her duty of loyalty through impermissible self-dealing when she purchased a reacquired BRT share through the sealed bidding process. We therefore reverse the district court so far as it found Trustee Edith had not breached her duty of loyalty, and we remand with instructions for the district court to order Trustee Edith to convey the BRT share she acquired back to the Trust.

**KAUTZ, J., concurring in part and dissenting in part.**

[¶67]   I concur in the majority's conclusions that Spike does not have standing to assert his declaratory relief claims and the eventual 2019 accounting was adequate.  I respectfully disagree with the majority's conclusion that the Trustees violated their fiduciary duties under the Trust by selling a share to Edith.

[¶68]   The majority correctly identifies Spike's claims that the Trustees breached their fiduciary duty.  He claims (1) "the Trustees … breached their fiduciary duties of loyalty by using the sealed bidding process to appraise the value of his gifted shares," and (2) "the Trustees … engaged in impermissible self-dealing when they sold the reacquired shares **at less than fair value** to the beneficiaries, which included Trustee Edith."  I agree with the majority that the Trustees did not breach any fiduciary duty by using a sealed bidding process to establish the fair value of the shares.  However, I break from the majority on its resolution of Spike's second claim of breach of fiduciary duty.  The Trustees did not sell, and could not have sold, a share to Edith for less than fair value because they used the fair value established by the sealed bidding process, which the majority acknowledges was proper.

[¶69]   Spike never argued that Trustee Edith, as a beneficiary, was wholly prohibited from purchasing shares the Trust reacquired under Article Twelfth.  Such an argument would be contrary to the Article's express terms which permit "any person descended from William Hathaway Forbes" to purchase the reacquired shares.  Edith is one such person.  Spike's only self-dealing objection was that Edith could not purchase the share for the value established by the sealed bidding process—an amount he claimed was less than fair value.  Because the sealed bidding process was an appropriate method for determining the value of shares, which could not be sold on the open market and necessarily had a discounted value because the equity represented by the shares would not be available for 18 years (at the time of the sealed bids), Edith did not acquire the share **at less than fair value**.

[¶70]   When a settlor clearly and unambiguously authorizes self-dealing by a trustee or trustees, as Article Twelfth does in this case, the settlor's intent controls and a trustee's right to self-deal is limited only by the prohibitions against acting in bad faith or unfairly.  *Shriners Hosps. for Children*, ¶ 57, 373 P.3d at 409; Restatement (Third) of Trusts § 78 cmt. (c)2.  The majority concludes the sale of a share to Edith for the fair value properly established by the sealed bidding process was either unfair or in bad faith.  I disagree.  The sealed bidding process provided no advantage to the Trustees, including Edith.  Every potential purchaser was given an opportunity to bid, and the bids were sealed.  All bids exceeded the minimum established by the Trustees, so the minimum bid was meaningless.  The process required the shares be resold to the highest bidders, but preferred non-trustees if there was a tie.  Although the majority states that "Edith unfairly acquired one share," it does not provide any explanation of how the price she paid or the process the Trustees followed was unfair.  In fact, it reached the opposite conclusion when, in deciding Spike's

24

first claim of breach of fiduciary duty, it determined the process and price were fair.

[¶71]  Because the Trust specifically authorized the Trustees to sell reacquired shares to any descendent, and because the process utilized and the price developed from that process were fair and gave no advantage to Edith or any other Trustee, I would affirm the trial court's summary judgment on both of Spike's breach of fiduciary duty claims.